[J-65-2022] [MO: Donohue, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| ALLEGHENY REPRODUCTIVE HEALTH CENTER, ALLENTOWN WOMEN'S CENTER, DELAWARE COUNTY WOMEN'S CENTER, PHILADELPHIA WOMEN'S CENTER, PLANNED PARENTHOOD KEYSTONE, PLANNED PARENTHOOD SOUTHEASTERN PENNSYLVANIA, AND PLANNED PARENTHOOD OF WESTERN PENNSYLVANIA, | : : : : : : : : : : | No. 26 MAP 2021<br><br>Appeal from the Orders of the Commonwealth Court at No. 26 MD 2019 dated January 28, 2020, and March 26, 2021.<br><br>ARGUED: October 26, 2022 |
| Appellants | : : : : : | |
| v. | : : : : : | |
| PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, VALERIE A. ARKOOSH, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, ANDREW BARNES, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DEPUTY SECRETARY FOR THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES' OFFICE OF MEDICAL ASSISTANCE PROGRAMS, AND SALLY KOZAK, IN HER OFFICIAL CAPACITY AS DEPUTY SECRETARY FOR THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES' OFFICE OF MEDICAL ASSISTANCE PROGRAMS, | : : : : : : : : : : : : : : : : : : | |
| Appellees | : : | |

## CONCURRING OPINION

**JUSTICE WECHT**                              **DECIDED: January 29, 2024**

Since 1776, the Constitution of the Commonwealth of Pennsylvania has opened with a "Declaration of Rights," a declaration that begins by identifying the "Inherent rights of mankind."[1]  The "inherent and indefeasible rights" identified therein include the rights to enjoy and defend life and liberty and to pursue happiness.  Our Constitution further states that "everything" contained in the Declaration of Rights "is excepted out of the general powers of government and shall forever remain inviolate."[2]  In 1971, Pennsylvania became the first state in the nation to amend its constitution to add an explicit guarantee of equality of the sexes.[3]  With these founding enactments, our Constitution places certain guarantees beyond the reach of the legislature and establishes them as legal promises enforceable in Pennsylvania's courts.  "[T]he talismanic words, *I am a citizen of Pennsylvania*, secures [*sic*] to the individual his [or her] private rights" as guaranteed by our organic charter.[4]

I join the Majority's detailed articulation and application of these constitutional promises in this case, which addresses a challenge involving Pennsylvania's Medical Assistance Program ("the Program").  This program provides payment directly to health care providers for covered medical services available to enrollees.  The Abortion Control Act imposes a coverage exclusion under which the Program will not provide funds to

---

[1]  "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."  PA. CONST. art. I, § 1.

[2]  "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate."  PA. CONST. art. 1, § 25.

[3]  "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."  PA. CONST. art. 1, § 28 ("ERA").

[4]  *Brown v. Hummel*, 6 Pa. 86, 91 (1847) (emphasis in original).

cover abortions unless the pregnancy is the result of rape or incest, or unless an abortion is necessary to avert the death of the pregnant woman (hereinafter, "Coverage Exclusion").[5] The Program covers all other costs associated with pregnancy and childbirth, and it also covers all health care for men, including male reproductive health services. No equivalent or comparable coverage exclusion applies to men.

Several abortion providers ("Providers") filed a petition for review against the Department of Human Services ("DHS"), which administers the Program, seeking declaratory and injunctive relief from the Coverage Exclusion. Providers argued that the Coverage Exclusion violates the ERA and the equal protection provisions[6] of the Pennsylvania Constitution. In support of these claims, Providers averred that the Coverage Exclusion significantly harms women, as the Majority describes.[7] The Commonwealth Court permitted several lawmakers from the Pennsylvania Senate ("Senate Intervenors") and House of Representatives ("House Intervenors") to intervene in the matter (collectively, "Intervenors").[8] DHS and the Intervenors filed preliminary objections, arguing that the petition for review raised claims that had been decided by this Court in *Fischer v. Department of Welfare*.[9] DHS also asserted that Providers lack

---

[5] 18 Pa.C.S. §§ 3215(c), (j); *see also* 55 Pa. Code §§ 1141.57, 1163.62, 1221.57.

[6] PA. CONST. art. I, §§ 1, 26 & art. III, § 32.

[7] Maj. Op. at 7-9.

[8] *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 225 A.3d 902 (Pa. Cmwlth. 2020).

[9] 502 A.2d 114 (Pa. 1985).

standing.  The Commonwealth Court sustained the preliminary objections and dismissed the petition for review.[10]

The Majority reverses the Commonwealth Court's orders permitting intervention, sustaining the preliminary objections, and dismissing the petition for review.  I fully join the thorough and incisive Majority Opinion.  I write separately to address several important issues that this case implicates:

- the application of standing principles in light of *Robinson Township v. Commonwealth*;[11]

- the way in which courts frame the issues before them;

- judicial consideration of the state's interest purportedly advanced by the Coverage Exclusion;

- alternative arguments for recognizing a right to reproductive autonomy under both the United States and Pennsylvania Constitutions in the wake of *Dobbs v. Jackson Women's Health Organization*;[12] and

- judicial consideration of history and tradition in constitutional analyses.

## I. Provider Standing

Providers have standing in this case because they have plainly established that they are aggrieved as medical organizations that provide abortion services.[13]  To the

---

[10]    *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 249 A.3d 598 (Pa. Cmwlth. 2021).

[11]    83 A.3d 901 (Pa. 2013).

[12]    597 U.S. 215, 240 (2022).

[13]    Maj. Op. at 34.

extent that the Majority analyzes standing through the invocation of *Robinson Township*,[14] I note my ongoing disagreement with descriptors used throughout that 2013 opinion, descriptors that tend to understate "the severity of the position in which a plaintiff must find herself in order to establish standing."[15] In my view, it is not merely an undesirable choice that confers standing, but rather the dilemma of "[b]eing forced to choose between abdicating one's rights or willfully violating the law and subjecting oneself to sanctions."[16] In *Robinson Township*, Dr. Khan was forced into such a position.[17] Notwithstanding my disagreement with the adjectives upon which the *Robinson Township* Court relied to identify the types of choices that will confer standing in pre-enforcement challenges, the Court's analysis in *Robinson Township* supports our finding of standing in this case.

## II. Issue Framing

The Coverage Exclusion is a sex-based classification that applies only to health care sought by women, apportioning access to health care depending upon one's sex and excluding funding for abortion, while simultaneously funding all reproductive health care for men.[18] Any statute that singles out and targets the reproductive health choices

---

[14]    83 A.3d at 923-25; Maj. Op. at 29 (repeating *Robinson Township*'s application of standing principles to pre-enforcement review of statutory provisions where the parties "must choose between equally unappealing options and where the third option is equally undesirable").

[15]    *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 495 (Pa. 2021) (Wecht, J., concurring).

[16]    *Id*.

[17]    *Robinson Township*, 83 A.3d at 924.

[18]    *See New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 856 (N.M. 1998) (holding that a coverage exclusion that denied state funding for medically necessary abortions singled out for unfavorable treatment a sex-linked condition that is unique to women and is presumptively unconstitutional); *Doe v. Maher*, 515 A.2d 134 (Conn. Super. 1986) ("Since only women become pregnant, discrimination against (continued…)

of women, that creates a sex-based classification, or that arises from and perpetuates sex-based stereotypes, will trigger scrutiny under our ERA.

Intervenors characterize this case as having nothing to do with the right to an abortion. Rather, Intervenors perceive the question implicated here as involving solely the right to government funding.[19] In *Fischer v. Department of Public Welfare,* this Court made the same mistake, identifying the right that it was confronting as "the purported right to have the state subsidize the individual exercise of a constitutionally protected right, when it chooses to subsidize alternative constitutional rights."[20] The Court found this right "nowhere in our state Constitution," and indicated that such a right could not be considered fundamental.[21]

It is a familiar tactic of courts that are about to deny the existence of a civil right to define the right so narrowly that the right, so defined, will not be found in the applicable constitution. In *Bowers v. Hardwick*, for example, the Supreme Court of the United States disparagingly and crassly characterized the issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy."[22] Unsurprisingly, like this Court in *Fischer*, the Court did not discover this right on the face of the Constitution. The Court corrected its mischaracterization in *Lawrence v. Texas*, recognizing that such framing "disclose[d] the Court's own failure to appreciate the extent

---

pregnancy by not funding abortion when it is medically necessary and when all other medical expenses are paid by the state for both men and women is sex oriented discrimination.").

[19]     *See* Maj. Op. at 22.

[20]     502 A.2d at 121; Maj. Op. at 63.

[21]     *Fischer*, 502 A.2d at 121; Maj. Op. at 63.

[22]     478 U.S. 186, 190 (1986).

of the liberty at stake."[23]  Explaining that the *Bowers* formulation of the issue demeaned the claim that the individual put forward, "just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse,"[24] the *Lawrence* Court recognized that the laws involved in *Bowers* and in *Lawrence* touched upon nothing less than the liberty of personal relationships.[25]

In *Dobbs*, the Court likewise reduced the issue before it to the narrowest possible articulation: the right to abortion, rather than the broader right to personal autonomy.[26] Such thin constructions of rights myopically disregard the broader guarantees within which they sit.  Framing the issue before us as implicating a right to abortion *funding* instead of a right to equal health care would repeat the mistakes of *Bowers* and *Fischer*, dishonoring the broader right at stake: the guarantee of equal treatment under the law.

This case is no more about a right to state funding of abortion, as Intervenors declare, than our decision in *Hartford Accident and Indemnity Company v. Insurance Commissioner of the Commonwealth* was about the right to insurance discounts,[27] or our decision in *Cerra v. East Stroudsburg Area School District* was about the right to

---

[23]     539 U.S. 558, 567 (2003).

[24]     *Id*.

[25]     *Id*. (recognizing that the challenged statutes reached "the most private human conduct" and "the most private of places," seeking to control a personal relationship that, "whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals").

[26]     597 U.S. at 216 ("[T]he Fourteenth Amendment does not protect the right to an abortion.").

[27]     482 A.2d 542, 548 (Pa. 1984) (holding that the ERA is violated by an insurance company's assessment of higher insurance rates for men than for women).

continued employment.[28]  Unlike the *Fischer* Court, and contrary to Intervenors' framing, we will not minimize the claim for equal access to health care and the right to non-discrimination in the exercise of civil rights as merely a right to state funding.  If the ERA is to have any meaning, it must guarantee equal treatment for women's health care.  The state cannot restrict women's access to health care in ways that the government does not restrict men's access.  Referring to this case as involving merely a funding issue assumes the premise that women are not entitled to all that the law provides to men, belittling the lives of women and casting them as second-class participants in a state-funded health care scheme.

### III. State Interest

I agree with the Majority that, under the Equal Rights Amendment to the Pennsylvania Constitution, a sex-based distinction is presumptively unconstitutional.[29] The right of citizens to be free from sex-based distinctions in the law, like many constitutional individual rights, partially cabins the General Assembly's authority, under its police power, to enact laws to protect the public health, safety and welfare of Pennsylvanians.[30]  When individual rights conflict with the exercise of the government's police power, it falls to the courts to subject such legislative enactments to a constitutional analysis.[31]  Under the constitutional analysis mandated by the ERA, the government

---

[28]     299 A.2d 277, 280 (Pa. 1973) (holding that the termination of a pregnant woman's employment on the basis of a physical condition unique to her sex was "sex discrimination pure and simple").

[29]     Maj. Op. at 123.

[30]     *Id*. at 119-20.

[31]     *Id*. at 120 (citing *Nixon v. Commonwealth*, 839 A.2d 277, 286 (Pa. 2003) (acknowledging that, although "the General Assembly may, under its police power, limit those rights by enacting laws to protect the public health, safety, and welfare," such laws are "subject to judicial review and a constitutional analysis")).

bears the burden of rebutting the presumption that a sex-based distinction is unconstitutional with evidence of a compelling state interest and evidence that there are no less intrusive means to support that expressed interest.[32]

This presumption mirrors our treatment of the Non-Discrimination Provision of the Pennsylvania Constitution, under which the Commonwealth is prohibited from discriminating against any person in the exercise of a civil right.[33] When it seeks to classify individuals for different treatment on the basis of their exercise of a civil right, the Commonwealth is required to establish that those classifications are justified.[34] Because the Coverage Exclusion discriminates against women on the basis of their exercise of a fundamental right, it similarly can survive only if it can weather strict judicial scrutiny under which the government establishes that the classification is necessary to achieve a compelling state interest and that the classification is narrowly tailored to effectuate that interest.[35]

Because DHS and the Commonwealth Court relied exclusively upon *Fischer* to support their preliminary objections and to dismiss the petition for review, the parties have not yet had the opportunity either to support or to rebut the purported state interest behind the Coverage Exclusion. They will have this opportunity on remand. An attentive reader understandably might perceive and question the absence of any substantial discussion of the state's ostensible interests in the Majority Opinion in this case. This absence does

---

[32]   Maj. Op. at 123.

[33]   PA. CONST. art. I, § 26 ("Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.").

[34]   Maj. Op. at 211.

[35]   *Id*. at 217.

not presuppose or presume the lack of any state interest but instead simply reflects the current procedural posture of this case. At this juncture, we are deciding only the nature of the constitutional rights that are implicated by the Coverage Exclusion. It is for the court on remand to hear in the first instance from the parties about the state interest purportedly advanced by the Coverage Exclusion.

Candor compels acknowledgment of the strong and closely held beliefs of many people in this Commonwealth and their representatives who view fetal life as fully vested human life, and who place the state's interest in preserving fetal life above all other interests. For many people in this Commonwealth, the presence of a fetus renders the evaluation of the state's interest in the context of abortion restrictions such as the Coverage Exclusion inherently different from the state's interest in other contexts because abortion restrictions uniquely involve destroying embryos or fetuses. I reserve judgment regarding the nature and impact of the state's interest *vis-à-vis* the constitutional rights that we recognize today. Here, I offer a few observations.

At some basic level, the debate is irreducible, the competing perspectives irreconcilable, partaking as they do of profound questions about the meaning of human life and when it begins. Pennsylvania's Constitution is invoked in this appeal, and so this Court must interpret that charter as we weigh the challenge before us. Hence, while we acknowledge the reality that profound moral claims cannot always be neatly resolved with logical certainty, judgment must be had. This case having come before us, such judgment is our role.

The parties agree that the state interest advanced by the Coverage Exclusion is the preservation of the life and health of fetuses and women.[36] To this end, the House

---

[36] Providers' Brief at 73; Senate Intervenors' Brief at 54; House Intervenors' Brief at 51.

Intervenors add that the state interest also generally encompasses promoting childbirth.[37] We need look no further than the Coverage Exclusion itself, as the legislation articulates the interest that it purportedly advances: to "protect hereby the life and health of the woman subject to abortion and to protect the life and health of the child subject to abortion."[38]

Presently, Intervenors rely upon *Fischer*'s characterization of this interest as important and legitimate,[39] and further assert that this interest is compelling. The *Fischer* Court relied upon the state's interest as articulated in *Roe v. Wade*,[40] an interest in "potential life which may be destroyed" that may justify certain restrictions upon the performance of abortion.[41] The Senate Intervenors assert that the state's interest bears the approval of the Supreme Court of the United States, which recognized in *Roe* the state's efforts to further "its legitimate goal of protecting the life of the unborn [ ] even when in so doing the State expresses a preference for childbirth over abortion."[42] According to the Senate Intervenors, the Coverage Exclusion is narrowly tailored to serve the government's interest in protecting life because it withholds funds that would end the life of the fetus while making an exception to this restriction to protect the life of the mother. Intervenors and their *amici* attempt to demonstrate the consistency of the

---

[37]    House Intervenors' Brief at 69.

[38]    18 Pa.C.S. § 3202(a).

[39]    *Fischer*, 502 A.2d at 122 (characterizing the governmental interests of preserving life as important and legitimate); *see also Dobbs*, 597 U.S. at 301 (applying rational basis review and holding that the state's interest in protecting unborn life is legitimate).

[40]    410 U.S. 113 (1973), *overruled by Dobbs*, 597 U.S. at 231.

[41]    *Fischer*, 502 A.2d at 118 (citing *Roe*, 410 U.S. at 162).

[42]    Senate Intervenors' Brief at 36.

government's interest in protecting life by referring to various legislative initiatives promoting childbirth and newborn care. For example, the House Intervenors rely upon annual appropriations to fund Real Alternatives, a program to support alternatives to abortion.[43] The House Intervenors further rely upon the following legislation effectuating the state's interest in protecting the life and health of unborn fetuses: the Newborn Protection Act, otherwise known as the Safe Haven Law;[44] the Crimes Against the Unborn Child Act;[45] the elimination of the cause of action for wrongful birth and wrongful life;[46] the prohibition of a defense against a cause of action for an injury sustained in utero;[47] the Newborn Child Testing Act;[48] the Keystone Mothers' Milk Bank Act;[49] the Freedom to Breastfeed Act;[50] and the Maternal Mortality Review Act.[51]

---

[43]    House Intervenors' Brief at 52 (citing https://www.realalternatives.org/ (last viewed June 21, 2023) (describing the Real Alternatives Program as "the non-profit, charitable organization that administers the Pregnancy and Parenting Support Services for . . . Pennsylvania . . . funded by the Commonwealth.")).

[44]    23 Pa.C.S. §§ 6501-09.

[45]    18 Pa.C.S. § 2601-2609 (requiring the killing or injury of an unborn child to be charged as homicide or aggravated assault).

[46]    42 Pa.C.S. § 8305.

[47]    42 Pa.C.S. § 8306 ("Where a person has, by reason of the wrongful act or negligence of another, sustained injury while in utero, it shall not be a defense to any action brought to recover damages for the injury, or a factor in mitigation of damages, that the person could or should have been aborted.").

[48]    35 P.S. §§ 621-625 (mandating newborn screening).

[49]    35 P.S. §§ 5011-5024.

[50]    35 P.S. §§ 636.1-636.4.

[51]    35 P.S. §§ 10241-10248.

The House Intervenors also highlight administrative programs that demonstrate the state's interest in favoring childbirth, including: infant and pre-natal health services and programs administered by the Bureau of Family Health within the Department of Health; programs directed at reducing infant mortality and improving birth outcomes administered by the Division of Child and Adult Health Services, such as lead poisoning prevention and SIDS education; the provision of baby formula, newborn services, and breastfeeding support by the Division of Newborn Screening; and programs attending to the special health care needs of children and youth by the Division of Community Systems Development and Outreach. *Amici* support these arguments by referring to additional state-level programs and initiatives.[52] House Intervenors and the Senate Intervenors separately invoke the state's interest in protecting women's health, supported by their *amici*.[53]

By contrast, the petition for review presents the myriad ways in which the Coverage Exclusion increases risks to women's health, including the medical risks of delayed

---

[52]     *See Amicus Curiae* The Pennsylvania Pro-Life Federation at 3 (relying upon the Probate, Estates and Fiduciaries Code, 20 Pa.C.S. § 5429, which bars the withholding of life sustaining treatment for a pregnant patient pursuant to a living will or health care directive); *Amicus Curiae* Members of the Republican Caucus of the Pennsylvania House of Representatives at 16 (relying upon the Down Syndrome Prenatal and Postnatal Education Act, 35 P.S. §§ 6241-6244 and the regulation of abortion clinics in the Health Care Facilities Act, 35 P.S. §§ 448.101-448.904b).

[53]     *See Amicus Curiae* Guiding Stars Ministries Brief at 6 (speculating that the public funding of abortions will lead to the coercion of women to obtain abortions and will subject women who refuse to obtain an abortion to violence by the father); *id*. at 15 (asserting that abortion has negative health consequences for women, including risk of death, cancer, birth defects, and behavioral changes); *Amicus Curiae* Texas Right to Life Brief at 6-8, 10-12 (including, among purported physical threats to women's health posed by abortion, a higher risk of breast cancer, organ damage, ectopic pregnancies, infections, obstetric hemorrhage, placenta previa, low birth weight in future pregnancies, stillbirth or preterm birth in future pregnancies, miscarriage in future pregnancies, and psychological injuries).

abortion,[54] a fourteen-fold increase in maternal mortality associated with childbirth as compared to abortion,[55] the aggravation of health problems caused by pregnancy,[56] and the psychosocial harm associated with being forced to have a child that the woman does not want.[57] Providers' *Amici* also emphasize the increasing maternal mortality rates in the Commonwealth of Pennsylvania.[58]

Providers believe that the state could advance its interest in preserving the health and life of fetuses in a more narrowly-tailored fashion that does not infringe upon a constitutional right by, for example, addressing racial and ethnic inequities in pregnancy outcomes and increasing early prenatal care.[59] The Senate Intervenors respond by asserting that it is the role of government to strike "the appropriate balance between a woman's right to reproductive choice and the Commonwealth's interest in preserving life."[60] In the Senate Intervenors' view, addressing racial and ethnic inequities in pregnancy outcomes or increasing early prenatal care would not prevent pregnancies from being terminated and therefore would not be tailored to the government's interest in protecting life.

---

[54]     Providers' Brief at 5.

[55]     *Id*. at 5-6, 75 (observing that the rate of maternal death has more than doubled since 1994).

[56]     *Id*. at 6.

[57]     *Id*.

[58]     *Amicus Curiae* New Voices for Reproductive Justice and Pennsylvania and National Organizations Advocating for Black Women and Girls Brief at 7 (observing that although eleven percent of women in the Commonwealth are black, black women account for thirty-one percent of pregnancy-related deaths).

[59]     Providers' Brief at 76 n.34.

[60]     Senate Intervenors' Brief at 55.

Although we are remanding for the development of the state's interest, I observe that, by design, the Coverage Exclusion coerces women who cannot afford private health care into carrying pregnancies to term. Any interest advanced by the Coverage Exclusion, therefore, can be understood only as an interest that is advanced at the cost of forcing women to bear children against their will. It will be DHS's unenviable burden on remand to establish that a state interest that is advanced through the coercive use of women's bodies is constitutionally compelling and that the Coverage Exclusion is narrowly tailored.

When it develops its interest, the state cannot rely upon any notion of enforcing sex roles, as any interest that relies upon sex-based stereotypes will run afoul of the ERA.[61] The provision of unequal health care and the coercion of women to give birth against their will would seem to serve archaic and stereotypical notions about women, rooted in beliefs about the primacy of childbearing and the disapproval of women who feel compelled to discontinue their pregnancies. To manifest respect for a woman as a mother while manifesting disrespect for a woman's health care decisions is to perpetuate a value-laden, sex-based stereotype. Women's reproductive capacity and their ability to become mothers traditionally has long been used as justification for perpetuating distinctions between the sexes.[62] The state may not constitutionally advance its purported interest in promoting motherhood by pre-ordaining that role for all women.

---

[61] *Hartford*, 482 A.2d at 548 ("Gender-based rates such as Hartford's rely on and perpetuate stereotypes similar to those condemned in [prior] cases."); *Ex rel Spriggs v. Carson*, 368 A.2d 635, 639 (Pa. 1977) ("We also question the legitimacy of a doctrine that is predicated upon traditional or stereotypic roles of men and women in a marital union.").

[62] Maj. Op. at 88-90; *see also, e.,g., Muller v. Oregon*, 208 U.S. 412, 421 (1908) (upholding legislation that limited the number of hours a woman could work in a laundry based upon a woman's "physical structure and the performance of maternal functions," as well as her historical dependence upon a man, as essential to "vigorous offspring" and "the strength and vigor of the race").

A sex equality approach to reproductive rights under the ERA requires the court below to probe the state's purported interests rather than to accept them at face value. Analyzing the state's proffer could require an examination of whether the state's purported interest in women's health and potential life is asserted only against women who do not conform to legislators' expected sexual and parenting roles or whether the state uses its policy prerogative consistently to protect potential life in other contexts and supports women who choose to give birth.[63]  Where the legislature uses the law to coerce but not to support women in bearing children, its purported interest in potential life rings hollow.

To assess whether the Coverage Exclusion in particular is narrowly tailored to advance a compelling government interest in potential life, it may be helpful to analyze the exclusion in the larger context in order to determine whether the state advances its interest selectively in ways that depend upon controlling women.[64]  A state concerned with protecting potential life could show that it advances this interest in ways that support women who choose to have children in their efforts to bear and raise a healthy child by, for instance, providing effective sex education, ensuring access to contraception, offering comprehensive health care aimed at reducing infant and maternal mortality, enacting policies that seek to reduce the negative health consequences of pregnancy, addressing the financial reasons that may cause women to choose to end a pregnancy, supporting

---

[63]     See Reva B. Siegel, *Sex Equality Arguments for Reproductive Rights: Their Critical Basis and Evolving Constitutional Expression*, 56 EMORY L. J. 815, 821 (2007) (suggesting that courts ought to evaluate the state's interest by examining whether the interest manifests only in ways that coerce women or if the state acts consistently to protect potential life in other ways).

[64]     There is nothing novel in strictly scrutinizing legislation in context to ensure that it is narrowly drawn to accomplish compelling governmental interests.  In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), for example, the Court held that challenged ordinances were "overbroad or underinclusive in substantial respects" because the government failed to pursue its proffered objectives in alternative ways that would not have burdened constitutional rights.

mothers in their education and continued employment, or directing resources at reducing infant mortality.[65]

Others have noted that the state's interest in potential life rings hollow if the state chooses to burden the rights of women while simultaneously refusing to protect actual life once a fetus becomes a child.[66]  As this argument goes, without committing to protecting the welfare of human lives after they are born, the state cannot rely in good faith on the narrow tailoring of its purported interest in protecting the lives that are forming inside of human beings.  If the state declines to abate the risks inherent to being born to mothers who may struggle to support children financially, it may be unpersuasive for the state to rest upon its purported interest in protecting fetal life.

The state will also bear the burden of demonstrating that the Coverage Exclusion manifests the state's purported interest in fetal health.  The Coverage Exclusion contains no exception for an abortion that the woman seeks because the fetus is not viable or

---

[65]     *See, e.g.,* Reva Siegel, *Prochoicelife: Asking Who Protects Life and How—and Why it Matters in Law and Politics*, 93 IND. L.J. 207, 210-11 (2018) ("As theorists of reproductive justice emphasize, many kinds of laws shape the conditions in which women conceive and bear children.  Laws on sexual education, contraception, abortion, health care, welfare, and employment all can play a role in protecting new life as they change the contexts in which women make decisions about conception, abortion, and childbearing, and as they alter the resources available to pregnant women and new mothers.  A government that wished to reduce the number of abortions would not rely on abortion law alone, even in jurisdictions where it is permissible to criminalize the practice.") (citations omitted).

[66]     *See* Leah A. Plunkett & Michael S. Lewis, *The Wages of Crying Life: What States Must do to Protect Children After the Fall of* Roe, 2022 PEPP. L. REV. 14, 17–18 (2022) (asking that "those who say they are 'Pro-life' in politics and law demonstrate that they protect vulnerable life beyond the abortion context, and they do so in the most minimal and obvious fashion by committing, at least, to protecting the basic welfare of the most vulnerable children").

because it suffers from a fatal impairment. Thus, it will be incumbent upon the state to explain how the Coverage Exclusion serves the state's interest in fetal health.[67]

To the extent that DHS relies upon the purported state interest in the health of the woman seeking an abortion, it bears noting that the Coverage Ban contains no exception for abortions that are medically necessary for the woman's health. Providers and their *Amici* have raised a plethora of evidence showing that the Coverage Exclusion operates contrary to that interest by sacrificing women's health in service of the interest in protecting fetal life. A state interest that truly was concerned with protecting women's health would contain an exception to the Coverage Exclusion for the health of the woman even when she does not face death, yet the Coverage Exclusion omits any such exception.[68] As this case proceeds on remand, and as the lower court subjects the purported government interest to a searching judicial inquiry, it will be incumbent upon the state to demonstrate how the Coverage Exclusion's denial of abortions that are medically necessary for the woman's health—which denial, according to Providers' assertions, severely undermines women's health—is somehow serving the state's interest in protecting women's health.

In establishing its interest, the Commonwealth may not run afoul of other constitutional provisions. For instance, the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise

---

[67] *See New Mexico Right to Choose,* 975 P.2d at 857 (finding that a coverage exclusion was not the least restrictive means of advancing the state's interest in potential life because it permitted the denial of an abortion that was necessary because of the health of the fetus).

[68] *See Maher*, 515 A.2d at 156-57 (rejecting as support for a coverage exclusion the proffered state interest in protecting the health of pregnant women because this interest had no application to funding restrictions for medically necessary abortions that are in service of women's health).

thereof. . . ."[69]  Religiously inspired abortion restrictions may constitute the establishment of religion and prohibit individuals in the exercise of their faith (or lack thereof).[70]  In *Harris v. McRae*, the challengers argued that the Hyde Amendment, a statute precluding the use of public funds to fund abortions, contravened the Establishment Clause because it incorporated religious doctrines regarding the sinfulness of abortion and the time at which life begins.[71]  The United States Supreme Court rejected this argument.[72]  Although *Harris* suggests that the Supreme Court is unlikely to invalidate abortion restrictions on Establishment Clause grounds, the Establishment Clause could limit the range of interests that the state is entitled to advance.  The same limitation applies to the state's interest through the religious freedom guaranteed by the Pennsylvania Constitution.[73]  As suggested by the range of *amicus* briefs on both sides of this case, religious perspectives

---

[69]  U.S. CONST. amend. I.  These provisions are applicable to the states via the Fourteenth Amendment.  *See Everson v. Bd. of Educ.,* 330 U.S. 1 (1947); *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Hamilton v. Regents of the Univ. of California*, 293 U.S. 245 (1934).

[70]  *See* Karen F. B. Gray, *An Establishment Clause Analysis of* Webster v. Reproductive Health Services*,* 24 GA. L. REV. 399, 402 (1990) ("Under the establishment clause . . . , the Court should have emphasized the importance of freedom from proscribed religious beliefs: prohibiting the government from showing any favoritism to a religious sect, or religion itself, and from taking any action that will be perceived as showing favoritism.").

[71]  448 U.S. 297, 319 (1980).

[72]  *Id*. at 320 ("The fact that the funding restrictions in the Hyde Amendment may coincide with the religious tenets of the Roman Catholic Church does not, without more, contravene [the Establishment] Clause.").

[73]  PA. CONST. art. I, § 3 ("[N]o human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.").

often inform individual understandings of when life begins.[74]  The state's interest in protecting fetal life cannot be based upon a religious view of morality or upon religious notions of when life begins or ensoulment occurs.  Such spiritual matters have no more role in government policy than government has in religious doctrine.

Should the Commonwealth establish a compelling government interest that is narrowly tailored, this interest will be balanced against a woman's right to equality and against her fundamental right to make decisions about her own life and well-being, particularly in the context of the serious threats upon which Providers rely.  Many courts that have engaged in this kind of balancing under heightened scrutiny have held that women's decisional autonomy regarding their own well-being is primary.[75]  In today's case, however, the Majority Opinion correctly leaves such matters to be decided at another time.[76]

---

[74]     *Compare Amicus Curiae* Jewish Pro-Life Foundation, Institute for Judaism and Civilization, Inc., Beit Emunah, LLC, Rabbi Menashe Bovit and Rabbi Yakov David Cohen, Brief at 8-10 (relying upon faith to advocate for the Coverage Exclusion) *with Amicus Curiae* National Council of Jewish Women, Catholics for Choice, and Other Faith-Based Organizations, Brief at 5 (asserting that "[r]eligious teachings on abortion make clear that reproductive choice is fundamentally a matter of personal conscience that is informed by faith-based beliefs").

[75]     *See, e.g., Department of Health v. Planned Parenthood of Alaska*, 28 P.3d 904, 913 (Alaska 2001) ("[A]lthough the State has a legitimate interest in protecting a fetus, at no point does that interest outweigh the State's interest in the life and health of the pregnant woman."); *Maher*, 515 A.2d at 157 (concluding that under the federal and state constitutions the government's interest in protecting potential life "cannot outweigh the health of the woman at any stage of the pregnancy"); *Right to Choose v. Byrne*, 450 A.2d 925, 937 (N.J. 1982) ("A woman's right to choose to protect her health by terminating her pregnancy outweighs the State's interest in protecting a potential life at the expense of her health."); *Comm. to Defend Reprod. Rights*, 625 P.2d 779, 781 (Cal. 1981) ("[T]he asserted state interest in protecting fetal life cannot constitutionally claim priority over the woman's fundamental right of procreative choice.").

[76]     *See* Maj. Op. at 116 (recognizing that the question remains whether the legislative determination trumps the constitutional guarantee expressed in the Equal Rights Amendment).

## IV. Federal Constitutional Law

The present opportunity to explore the demands of the ERA, the right to reproductive autonomy, and Pennsylvania's Non-Discrimination Provision arises in the wake of the Supreme Court of the United States' decision in *Dobbs*.[77] Although federal law in general and *Dobbs* in particular do not govern claims brought under the Pennsylvania Constitution, a discussion of the federal constitutional underpinnings of reproductive freedom is instructive here.

Prior to *Dobbs*, *Roe* had been the law of the land for nearly fifty years. The federal right to abortion announced in *Roe*[78] and reaffirmed in *Planned Parenthood v. Casey*[79] was predicated upon liberty and privacy interests ostensibly protected by the Due Process Clause of the Fourteenth Amendment, which provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law."[80] As a textual matter, the Due Process Clause guarantees fair legal procedures, obligating the government to engage in a fair process before depriving anyone of his or her right to life, liberty, or property. Over time, the guarantee of procedural due process began to be understood

---

[77] 597 U.S. 215.

[78] 410 U.S. at 153 (holding that the right to privacy, "whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people," encompassed a woman's right to terminate her pregnancy).

[79] 505 U.S. 833, 851 (1991) ("These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment."), *overruled by Dobbs*, 597 U.S. 215.

[80] U.S. CONST. amend. XIV.

also to include substantive limitations upon the sort of laws the government could enforce.[81]

I have recently explored the oxymoronic extension of the Due Process Clause from procedural guarantees to substantive rights in the context of the limitations that federal substantive due process imposes upon punitive damages.[82]  Relying upon the Due Process Clause as the textual basis for substantive federal constitutional rights has been problematic from its inception, from the paradoxical framing of the concept of substantive due process to its expansion to encompass an immense body of law.[83]  The substantive iterations of the Due Process Clause have never aligned with its procedural predicate.[84] Although I believe that the United States Constitution protects unenumerated rights, I have expressed elsewhere my belief that the judicially-manufactured construction of substantive due process as a home for those rights has proven inadequate.[85]  My disagreement with substantive due process is not a rejection of federal constitutional recognition of unenumerated rights but is rather an objection to tasking the procedural framework of the Due Process Clause to protect those substantive rights.  As I explained

---

[81]     *Casey*, 505 U.S. at 846 ("Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years. . . the Clause has been understood to contain a substantive component.").

[82]     *The Bert Co. v. Turk*, 298 A.3d 44, 86-95 (Pa. 2023) (Wecht, J., concurring).

[83]     *See Saenz v. Roe*, 526 U.S. 489, 527 (1999) (Thomas, J., dissenting) (observing that "the demise of the Privileges or Immunities Clause has contributed in no small part to the current disarray of our Fourteenth Amendment jurisprudence").

[84]     *See, e.g.,* Akhil Reed Amar, *The End of* Roe v. Wade, WALL ST. J., (May 14, 2022) (observing that the Due Process Clause of the Fourteenth Amendment guarantees fair legal procedures, that the Texas abortion law at issue in *Roe* provided fair courtroom procedures, and that *Roe*'s due process argument was "textual gibberish").

[85]     *The Bert Co.*, 298 A.3d at 86-95 (Wecht, J., concurring).

in *The Bert Company*, the fundamental rights that the Supreme Court has attached to the Due Process Clause generally fall within the category of "none of the government's damn business," and are so fundamental to the "realm of personal liberty" that they warrant federal constitutional protection.[86]

As the Supreme Court now conceives of the Fourteenth Amendment, that provision protects only rights that are explicitly mentioned in the text of the Constitution or those that are "deeply rooted in the nation's history and tradition" and "implicit in the concept of ordered liberty."[87] After *Dobbs*, it is particularly important for advocates to advance and develop new legal theories, and to seek the abrogation of precedent that stands in the way. As the U.S. Supreme Court recently has demonstrated an eagerness to reconsider established precedent—even in the face of decades of reliance—advocates should not be dissuaded by the uphill battle that awaits those who might seek to enshrine unenumerated fundamental rights somewhere other than the unduly elasticized Due Process Clause.

Although the right to abortion as developed in *Roe* was held to derive from substantive due process under the Fourteenth Amendment, abortion rights supporters critical of *Roe*'s substantive due process analysis have long examined alternative federal constitutional provisions upon which to ground such a right. In *What* Roe v. Wade *Should Have Said*, eleven scholars wrote mock judicial opinions deciding *Roe* upon alternative

---

[86]     *Id*. at *34 (Wecht, J., concurring).

[87]     *Dobbs*, 597 U.S. at 231 (holding that the Due Process Clause of the Fourteenth Amendment "has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty'").

grounds.[88]  Of the eight scholars writing in support of abortion rights, four of them relied in whole or in part upon theories of gender equality instead of or in addition to theories of personal autonomy or privacy.[89]

The Supreme Court's decision to ground a right to abortion in substantive due process was not inevitable.  The litigants in *Roe* settled upon advocating for a right to privacy in order to fit their case within the right to privacy that had been established in *Griswold v. Connecticut* and defined as the right to control personal matters without government interference.[90]  Although Justice William O. Douglas' majority opinion in *Griswold* relied upon "penumbras" and "emanations" in the Bill of Rights, and ultimately settled upon the logic of privacy to strike down restrictions on contraception,[91] earlier

---

[88]     *See* Jack Balkin, Roe v. Wade*: An Engine of Controversy,* in WHAT *ROE V. WADE* SHOULD HAVE SAID: THE NATION'S TOP LEGAL EXPERTS REWRITE AMERICA'S MOST CONTROVERSIAL DECISION 3, 17-18 (Jack M. Balkin ed., 2005); Scott A. Moss & Douglas M. Raines, *The Intriguing Federalist Future of Reproductive Rights*, 88 B.U.L.REV. 175, 185 (2008) ("The extent to which abortion rights supporters are abandoning *Roe* for better arguments is perhaps clearest in Jack Balkin's bold and controversial book, *What* Roe v. Wade *Should Have Said*, in which eleven scholars wrote mock judicial opinions for *Roe*. Eight supported constitutional limits on abortion bans, but in a striking consensus none of the opinions adopted Justice Blackmun's original trimester framework.").

[89]     Moss & Rains, *supra* note 88, at 188.

[90]     381 U.S. 479, 485-86 (1965); *see also id*. at 484 (holding that the "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance," and that "[v]arious guarantees create zones of privacy").

[91]     *Id*. at 485 (holding that the right to privacy permits married couples to obtain and use contraceptives); *see also Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (holding that a Massachusetts statute permitting married persons to obtain contraceptives to prevent pregnancy but prohibiting distribution of contraceptives to single persons for that purpose violates the Equal Protection Clause).

challenges to these laws had been grounded on theories of sex equality.[92]  Similarly, prior to *Roe*, litigants brought challenges to abortion restrictions on a number of bases, including sex inequality[93] as well as race and class inequality.[94]  In *Hall v. Lefkowitz*, for example, a group of women challenged an abortion ban as being void for vagueness, as invading the right to privacy, as violating equal protection, and as denying due process.[95]  Activism surrounding the *Hall* lawsuit prompted the legislature to legalize abortion until the twenty-fourth week of pregnancy, effectively mooting the case.[96]  In *Abele v. Markle*,

---

[92]     *See* Melissa Murray, *Race-ing* Roe*: Reproductive Justice, Racial Justice, and the Battle for* Roe v. Wade, 134 HARV. L. REV. 2025, 2047-48 (2021) ("Early challenges to contraceptive bans noted that such laws placed heavier burdens on women than men, while other challenges emphasized privacy as a necessary precondition for structuring intimate life along more gender-egalitarian lines").

[93]     *Id*. at 2048 ("As feminists integrated abortion into their public discourse around sex equality, calls for sex equality were central to feminist legal challenges to abortion bans. In contrast to early abortion challenges, which were framed in terms of the professional obligations and rights of physicians, feminists challenging nineteenth-century abortion bans in the 1970s explicitly framed their claims in terms of liberty, women's equality, and sexual freedom."); *see also* Linda Greenhouse & Reva Siegel, BEFORE *ROE V. WADE*: VOICES THAT SHAPED THE ABORTION DEBATE BEFORE THE SUPREME COURT'S RULING 174 (2d ed. 2012) (tracing how the "arguments for liberalizing abortion law in the name of public health gave way over time to claims of the women's movement seeking for women liberty, equality, and dignity: women's right to control their own bodies and lives; to have their voices and decisions treated with respect; and to participate as equals in private and public life").

[94]     *See* Reva B. Siegel, Roe*'s Roots: The Women's Rights Claims that Engendered* Roe, 90 B. U. L. REV. 1875, 1889 (2010) (reviewing arguments that "emphasized the ways in which the social organization of motherhood varied across lines of socioeconomic class and race" and that asserted that "the criminalization of abortion specially harmed poor and minority women).

[95]     305 F. Supp. 1030, 1031 (S.D.N.Y. 1969) ("These are four separate actions challenging New York State's abortion laws on various grounds of constitutional infirmity, including but not limited to vagueness, invasion of right of privacy, denial of equal protection of the laws and due process.").

[96]     *See* Siegel, *supra* note 94, at 1886.

lawyers emphasized the gendered and racial impact of an abortion ban (at a time when there was no heightened scrutiny for sex discrimination) under the Equal Protection Clause.[97] The action proved successful, and the court invalidated Connecticut's criminal abortion statute.[98]

Several similar lawsuits were filed around the same time, appealing for authority to a range of constitutional sources. These included arguments that abortion restrictions violated: a woman's right to life and liberty under the Fourteenth Amendment; a woman's right to equal protection under the Fourteenth Amendment; the right of poor women to equal protection under the Fourteenth Amendment; the right to privacy as protected by the Ninth Amendment; the Eighth Amendment by imposing motherhood as a punishment for engaging in sex, a form of cruel and unusual punishment; the Thirteenth Amendment as a form of involuntary reproductive servitude; and the Nineteenth Amendment by forcing women to become mothers while organizing the core activities of citizenship to exclude caregivers.[99] Broader concerns about sexual freedom and government intrusion into private, intimate life also contributed to efforts to repeal and liberalize abortion laws.[100] All of this history indicates that, prior to *Roe*, litigants had advanced a number of theories to support their arguments against abortion bans and restrictions that reflected concerns independent of substantive due process.

---

[97]     452 F.2d 1121, 1123 (2d Cir. 1971) (discussing the initial claims as including an allegation that the abortion prohibition discriminated against women on the basis of sex); *Abele v. Markle*, 342 F. Supp. 800 (D. Conn. 1972) (on remand), *vacated as moot*, 410 U.S. 951 (1973).

[98]     *Abele*, 342 F.Supp. at 801-02.

[99]     *See* Siegel, *supra* note 94, at 1881-82 (collecting cases).

[100]     *See* Melissa Murray, *Essay,* Griswold*'s Criminal Law*, 47 CONN. L. REV. 1045, 1059 (2015) (discussing the concerns about selective enforcement of morals offenses).

Although *amicus* in *Roe* had advanced an argument premised upon equal protection,[101] the parties' advocates made a strategic decision to advance their claims under substantive due process.[102] The equality challenges central to the earlier cases did not make their way into the Court's articulation of abortion rights in *Roe*. Consequently, the *Roe* decision itself reflected a narrow understanding of the rights involved, focusing upon the role of physicians (rather than women), the state's police power, and the right to privacy through the lens of substantive due process.[103] *Roe* therefore said nothing about the relationship between the freedom to make one's personal decisions and equality for women.[104] In recognizing a woman's right to choose abortion in consultation with her physician as a matter of substantive due process, *Roe* effectively precluded the development of the right to abortion on other constitutional grounds, or at least rendered such development unnecessary. After *Roe* anchored the right to abortion in substantive due process, sealing off other potential wellsprings of the right under the federal Constitution, litigants and courts focused their arguments and resources upon the right as narrowly recognized in *Roe*.

Meanwhile, nascent sex equality claims under the federal Equal Protection Clause struggled to gain traction. Although the federal promise of equal protection applied to

---

[101]    *See Amicus Curiae* New Women Lawyers et al., at 26, *Roe v. Wade*, 410 U.S. 113 (1971).

[102]    Murray, *supra* note 92, at 2049 ("And critically, unlike the feminist lawyers who litigated *Abele* and *Lefkowitz*, the *Roe* lawyers, Linda Coffee and Sarah Weddington, did not frame their arguments in terms of sex equality or race and class inequality, choosing instead to root their claims in the privacy logic that had undergirded the Court's earlier contraception decisions.").

[103]    *Roe,* 410 U.S. at 153, *overruled by Dobbs*, 597 U.S. 215.

[104]    *See* Amar, *supra* note 84 (criticizing *Roe* for failing to discuss "the relationship of abortion rights to women's equality" and *Dobbs* for "saying little—too little—about sex and gender equality").

women as well as to men, for the first one hundred years after the ratification of the Fourteenth Amendment, the Supreme Court did not find any law unconstitutional because it discriminated on the basis of sex. It was not until 1971, the year that the ERA was adopted in Pennsylvania, that the United States Supreme Court concluded that unequal treatment of women on the face of the law could violate the federal constitutional guarantee of equal protection.[105]

Even then, the court declined to apply heightened scrutiny and instead applied a rational basis standard of review. In the 1973 case of *Frontiero v. Richardson*,[106] Justice William Brennan, writing for himself and three other Justices, called for the Court to recognize classifications on the basis of sex as inherently suspect, warranting strict judicial scrutiny.[107] In a concurring posture and writing for himself and two other Justices, Justice Lewis Powell disagreed that sex discrimination warranted strict scrutiny, citing the fact that the federal Equal Rights Amendment had been sent to the states for ratification just months before; if ratified, the Amendment would elevate sex to a suspect classification.[108] Justice Powell's concurrence deprived the Court of the requisite votes to subject sex discrimination to strict scrutiny under the Equal Protection Clause.

In 1974, the Supreme Court held that the Equal Protection Clause was not offended by the exclusion of pregnancy-related disability from a state disability insurance program because pregnancy "is an objectively identifiable physical condition with unique

---

[105] *Reed v. Reed*, 404 U.S. 71 (1971) (applying rational basis review to hold that a statute distinguishing between men and women in estate administration violated the Equal Protection Clause of the Fourteenth Amendment).

[106] 411 U.S. 677, 682 (1973).

[107] *Id*. As discussed, Justice Brennan's position did not garner a majority.

[108] *Id*. at 692 (Powell, J., concurring).

characteristics."[109]  Accordingly, discrimination on the basis of pregnancy was not sex discrimination under the federal Constitution.[110]  In 1976, the Supreme Court adopted heightened or "intermediate" scrutiny for sex-based classifications, requiring the government to establish that the classification serves important governmental objectives that are substantially advanced by the sex-based classification.[111]  Shortly thereafter, the Court resolved the abortion funding cases under the federal Constitution, holding that

---

[109]     *Geduldig v. Aiello*, 417 U.S. 484 (1974).  This characterization of pregnancy was part of the Majority's defense of its analysis from criticism by the dissent.  The *Geduldig* Majority believed that pregnancy discrimination has nothing to do with gender discrimination because it is a physical condition:

> The dissenting opinion to the contrary, this case is thus a far cry from cases like *Reed v. Reed*, 404 U.S. 71 (1971), and *Frontiero v. Richardson*, 411 U.S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition— pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed, supra*, and *Frontiero, supra*. Normal pregnancy is an objectively identifiable physical condition with unique characteristics. . . [L]awmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups— pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.

*Id.* at 497 n.20.

[110]     *Id*. at 494-95.

[111]     *See Craig v. Boren*, 429 U.S. 190, 197 (1976) ("[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.").

federal and state restrictions that barred Medicaid from funding abortions did not discriminate against a suspect class[112] and did not warrant heightened scrutiny.[113]

While gender equality as a matter of equal protection struggled to gain traction with a majority of the United States Supreme Court, Justice Harry Blackmun cited feminist views about the equality of women in his responsive opinion in *Casey*.[114] Similarly, in her dissent in *Gonzales v. Carhart*, Justice Ruth Bader Ginsburg attempted to tie the right to abortion to women's equality rather than to privacy.[115] Although a majority of the Supreme Court has never adopted the rationale that reproductive rights are derived from equality principles, academics steadfastly have continued to advance that rationale for recognizing the right to abortion in the federal Constitution.[116]

Although the parties did not brief an equal protection argument in *Dobbs*, *amicus* there offered an equal protection argument which asserted that laws regulating pregnancy are sex discrimination and are subject to heightened scrutiny; that the purported state interest reflected sex-role stereotypes; and that the state deliberately chose not to adopt less discriminatory and less coercive (but more effective) means of achieving its

---

[112]    *Maher v. Roe*, 432 U.S. 464, 470 (1977).

[113]    *Harris v. McRae*, 448 U.S. 297, 322-23 (1980).

[114]    505 U.S. at 928 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part) (recognizing that abortion restrictions implicate "constitutional guarantees of gender equality").

[115]    550 U.S. 124, 171-72 (2007) (Ginsburg, J., dissenting) (recognizing that abortion restrictions implicate a woman's control over her own destiny and that women have the "right to participate equally in the economic and social life of the Nation").

[116]    *See* Siegel, *supra* note 63, at 829*;* Ruth Bader Ginsburg, *Essay, Some Thoughts on Autonomy and Equality in Relation to* Roe v. Wade, 63 N.C. L. REV. 375 (1985); Sylvia A. Law, *Rethinking Sex and the Constitution*, 132 U. PA. L. REV. 955, 962-63 (1984).

purported goal of protecting women's health and fetal life.[117]  *Dobbs* without equivocation closed the door on federal equality arguments as a basis for the constitutional right, rejecting the argument advanced by *amici* because that theory was "squarely foreclosed by our precedents, which establish that a State's regulation of abortion is not a sex-based classification and is thus not subject to the 'heightened scrutiny' that applies to such classifications."[118]  Opening the door to arguments rooted in equal protection would require the Court to abrogate substantial precedent within its equal protection jurisprudence.  The federal Equal Protection Clause presently is not primed to advance a right to abortion in terms of women's equality.

Nevertheless, litigants should develop and advance alternative arguments for federal equal protection and for unenumerated rights under the federal Constitution. *Dobbs*' rejection of federal due process as the basis for a federal right to abortion opens the door to arguments that the right to abortion is rooted elsewhere in the federal Constitution.  To highlight a few possibilities in addition to the Equal Protection Clause, I discern intriguing arguments premised upon the Ninth Amendment, the Privileges or Immunities Clause, the Thirteenth Amendment, the First Amendment's Establishment Clause, the Eighth Amendment, and the Fifth Amendment.

The text of the Ninth Amendment, which provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people," plainly provides that the rights enumerated in the Constitution are not an

---

[117]  *See Amicus Curiae* Equal Protection Constitutional Law Scholars Serena Mayeri, Melissa Murray & Reva Siegel as *Amicus Curiae* Supporting Respondents at 1, *Dobbs*, 597 U.S. 215.

[118]  *Dobbs*, 597 U.S. at 236.

exhaustive list.[119] I have discussed elsewhere the viability of the Ninth Amendment as "[t]he most obvious constitutional source for the recognition of unenumerated rights."[120] Addressing the concern that the enumeration of certain rights in the Bill of Rights may imply the exclusion of others, the Ninth Amendment makes explicit the existence of those unenumerated rights that are protected from government infringement.[121] These unenumerated rights exist alongside—and in addition to—those rights enumerated in the Bill of Rights.

Before *Roe* made its way to the Supreme Court, the lower court had anchored its ruling in the Ninth Amendment, specifically holding that this Amendment rendered the abortion regulation unconstitutional.[122] The Supreme Court did not analyze this

---

[119] U.S. CONST. amend. IX.

[120] *The Bert Co.*, 298 A.3d at 95 (Wecht, J., concurring).

[121] *Id*. at 20 (Wecht, J., concurring) (reviewing the debate at the nation's founding between the Anti-Federalists, who advocated for the inclusion of the Bill of Rights in the federal Constitution, and the Federalists, who feared that enumerating the Bill of Rights would suggest that other rights were not protected); *see also* Randy E. Barnett, *The Ninth Amendment: It Means What It Says*, 85 TEX. L. REV. 1, 14 (2006) (concluding the Ninth Amendment guarantees the protection of unenumerated "individual, natural, preexisting rights"); James Wilson, *Remarks in Pennsylvania Constitution Debates* (Nov. 30, 1787), reprinted in 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, 436 (Merrill Jensen ed., 1976) ("A bill of rights annexed to a constitution is an enumeration of the powers reserved. If we attempt an enumeration, everything that is not enumerated is presumed to be given. The consequence is, that an imperfect enumeration would throw all implied power into the scale of the government, and the rights of the people would be rendered incomplete.").

[122] *Roe v. Wade*, 314 F. Supp. 1217, 1221 (N.D. Tex. 1970) (holding "that the Texas Abortion Laws must be declared unconstitutional because they deprive single women and married couples of their right, secured by the Ninth Amendment, to choose whether to have children"), *aff'd in part, rev'd in part by Roe*, 410 U.S. 113.

reasoning.[123] After the Supreme Court settled upon the Due Process Clause as the source of the right to abortion, courts have not attempted to return to the Ninth Amendment as the root of that right. Although largely ignored by the Supreme Court,[124] the Ninth Amendment may provide a solid foundation for reproductive autonomy. In a concurring opinion in *Griswold*, for example, Justice Arthur Goldberg persuasively developed his position that the Ninth Amendment's protection of unenumerated rights encompasses "the right of privacy in marriage," including the right to contraception.[125] While this idea has yet to find traction in the Court, academics and scholars have continued to afford the Ninth Amendment more careful and thorough consideration.[126] With the overruling of *Roe* in *Dobbs*, the Ninth Amendment is ripe for reinvigoration.

---

[123]     *Roe*, 410 U.S. at 153 ("This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.").

[124]     *See* Chase J. Sanders, *Ninth Life: An Interpretive Theory of the Ninth Amendment*, 69 IND. L. J. 759, 769-72 (1994) (observing that the Supreme Court has played a negligible role in Ninth Amendment rights jurisprudence).

[125]     *See Griswold*, 381 U.S. at 495-96 (Goldberg, J., concurring) ("The fact that no particular provision of the Constitution explicitly forbids the State from disrupting the traditional relation of the family—a relation as old and as fundamental as our entire civilization—surely does not show that the Government was meant to have the power to do so. Rather, as the Ninth Amendment expressly recognizes, there are fundamental personal rights such as this one, which are protected from abridgment by the Government though not specifically mentioned in the Constitution.").

[126]     *See, e.g.*, Christopher J. Schmidt, *Revitalizing the Quiet Ninth Amendment: Determining Unenumerated Rights and Eliminating Substantive Due Process*, 32 U. BALT. L. REV. 169, 189-90 (2003); Sanders, *supra* note 124, at 764-69 (advocating that "[t]he Ninth Amendment protects the right to engage in, and prevents governmental encroachment into, any activity or practice which entails no possibility of harm to either the actor or other people. Only the significant possibility of tangible physical or economic harm, not 'harm' in the form of public disapproval or moral offense, can justify governmental intrusion under the Ninth Amendment.").

In addition to the Due Process Clause and the Equal Protection Clause, the Fourteenth Amendment is home to the Privileges or Immunities Clause, which provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."[127]  The text of this provision is broad enough, on its own or together with the Ninth Amendment, to anchor unenumerated rights in the federal Constitution and to protect such rights against state infringement.[128]  The United State Supreme Court, however, long ago stymied the development of the Privileges or Immunities Clause as a fount of unenumerated rights, holding in the *Slaughter-House Cases* that the clause protects citizens only against state infringement of rights created by the federal government, as opposed to rights that predated the creation of the federal government.[129]  Roundly criticized,[130] the *Slaughter-House Cases* "sapped the [Privileges or Immunities] Clause of any meaning."[131]  Although the Court has never overturned the *Slaughter-House Cases*, Justice Clarence Thomas has shown particular interest in revisiting the Privileges or Immunities Clause as a constitutionally legitimate source or

---

[127]    U.S. CONST. amend. XIV.

[128]    *See* Adam Lamparello, *Fundamental Unenumerated Rights Under the Ninth Amendment and the Privileges or Immunities Clause,* 49 AKRON L. REV. 179, 181 (2016) ("The Ninth Amendment's language means what it says: fundamental rights exist independently of the Constitution's text, and citizens are entitled to full enjoyment of those rights.  These fundamental rights *are* the Fourteenth Amendment's Privileges or Immunities.") (emphasis in original).

[129]    *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

[130]    *See The Bert Co.,* 298 A.3d at 98-101 (Wecht, J., concurring) (reviewing scholarship critical of the *Slaughter-House Cases*).

[131]    *Saenz*, 526 U.S. at 527 (Thomas, J., dissenting).

protector of fundamental rights.[132]  Should the Supreme Court show the same willingness to revisit its precedent limiting the Privileges or Immunities Clause that it applied to precedent expanding substantive due process, that clause may, on its own or together with the Ninth Amendment, prove ripe for reconsideration as a source for protecting and guaranteeing fundamental, unenumerated rights.

Several commentators have suggested that abortion restrictions may be vulnerable under the Thirteenth Amendment, the first section of which prohibits "slavery" and "involuntary servitude," except as a punishment for a crime, "within the United States, or any place subject to their jurisdiction."[133]  Involuntary servitude encompasses "the control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property and services."[134]  The Thirteenth Amendment argument suggests that forcing women to give birth, to endure the dangers of pregnancy and childbirth, is tantamount to involuntary servitude, and a dystopian attempt to turn back the clock to the days of coverture, before a woman could vote or own her own property.  As Professor Andrew Koppelman has argued, women who are forced to carry a pregnancy to term and to give birth against their will arguably are placed in involuntary reproductive servitude.[135]

---

[132]     *Id*. at 521 (Thomas, J., dissenting) (explaining that "the terms 'privileges' and 'immunities' (and their counterparts) were understood to refer to those fundamental rights and liberties specifically enjoyed by English citizens and, more broadly, by all persons").

[133]     U.S. CONST. amend. XIII.

[134]     *Plessy v. Ferguson*, 163 U.S. 537, 542 (1896) (overruled on other grounds by *Brown v. Board of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 492 (1954)).

[135]     Andrew Koppelman, *Forced Labor: A Thirteenth Amendment Defense of Abortion*, 84 NW. U. L. REV. 480, 484 (1990); *see also* Jamal Greene, *Thirteenth Amendment Optimism*, 112 COLUM. L. REV. 1733, 1739 n.36 (2012) (citing Laurence H. Tribe, *American Constitutional Law* § 15-10, at 1354 n.113 (2d ed. 1988) (contending that "[t]he (continued…)

This argument builds upon other creative invocations of the Thirteenth Amendment in academia.[136] According to Professor Koppelman, "abortion prohibitions violate the amendment's guarantee of personal liberty, because forced pregnancy and childbirth, by compelling the woman to serve the fetus, creates 'that control by which the personal service of one man is disposed of or coerced for another's benefit which is the essence of involuntary servitude.'"[137] Because forcing women to continue pregnancies against their will and to become mothers "makes them into a servant caste," Professor Koppelman argues, abortion prohibitions inflict "the same kind of injury that antebellum slavery inflicted" upon the enslaved, contrary to the Thirteenth Amendment.[138] Professor Laurence Tribe also believes that judicial recognition of the similarities between the

---

[T]hirteenth [A]mendment's relevance [to laws requiring a woman to continue an unwanted pregnancy] is underscored by the historical parallel between the subjugation of women and the institution of slavery")); *id.* (citing Donald H. Regan, *Rewriting* Roe v. Wade, 77 MICH. L. REV. 1569, 1619-20 (1979) (suggesting that the constitutional argument against abortion statutes could be based on nonsubordination and physical integrity values of the Thirteenth Amendment); Siegel, *supra* note 94, at 1884 n.34, 1891, 1896 n.98.

[136] *See* Greene, *supra* note 135, at 1739 (drawing upon prior examples of "Thirteenth Amendment Optimism," *i.e.*, arguments regarding the application of the Thirteenth Amendment that deserve to "be taken seriously"); Moss & Raines*, supra* note 88, at 189 n.79 (reviewing Thirteenth Amendment arguments against abortion restrictions); Akhil Reed Amar, *Comment, The Case of the Missing Amendments:* R.A.V. v. City of St. Paul, 106 HARV. L. REV. 124, 126 (1992) (contending that hate speech may "constitute [a] badge[] of servitude that may be prohibited under the Thirteenth and Fourteenth Amendments"); Akhil Reed Amar & Daniel Widawsky, *Commentary, Child Abuse as Slavery: A Thirteenth Amendment Response to* DeShaney, 105 HARV. L. REV. 1359 (1992).

[137] Koppelman, *supra* note 135, at 484 (quoting *Bailey v. Alabama*, 219 U.S. 219, 241 (1911)); *see also* Michele Goodwin, Opinion, *No, Justice Alito, Reproductive Justice Is in the Constitution*, N.Y. TIMES (Jun. 26, 2022), https://perma.cc/E2QX-GH6W ("This Supreme Court . . . ignores the intent of the 13th and 14th Amendments, . . . which extended . . . to shielding [black women] from rape and forced reproduction.").

[138] *Id.* at 485.

historical plight of women and the enslaved underscores the Thirteenth Amendment's relevance, and has asserted that a "woman forced by law to submit to . . . carrying, delivering, and nurturing a child she does not wish to have is entitled to believe that more than a play on words links her forced labor with the concept of involuntary servitude."[139] The Tenth Circuit recognized the logical force of this argument when it reversed the imposition of attorneys' fees for frivolous litigation, relying upon Professor Tribe's comments and the analogy between "restrictive state regulation of abortion and involuntary servitude."[140]

Blending the Thirteenth and Fourteenth Amendments together, Professor Jed Rubenfeld has argued that there is a freedom to choose one's occupation that extends to abortion rights.[141] Relying upon the Thirteenth Amendment's prohibition of states compelling individuals to fulfill employment contracts, and finding a right to privacy in the Privileges or Immunities Clause of the Fourteenth Amendment that includes the right to choose one's calling in life, Professor Rubenfeld asserts that, "[i]f a state cannot force a man to till a field, it cannot force a woman to mother a child."[142]

---

[139] *See* Moss & Raines, *supra* note 88, at 189 n.80 (quoting Lawrence H. Tribe, *American Constitutional Law* § 15-10, at 1354 (2d. ed. 1988)).

[140] *Jane L. v. Bangerter*, 61 F.3d 1505, 1515 (10th Cir. 1995); *see also Casey*, 505 U.S. at 928 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("By restricting the right to terminate pregnancies, the State conscripts women's bodies into its service, forcing women to continue their pregnancies, suffer the pains of childbirth, and in most instances, provide years of maternal care.").

[141] Jed Rubenfeld, *Concurring in the Judgment Except as to Doe*, in WHAT ROE V. WADE SHOULD HAVE SAID: THE NATION'S TOP LEGAL EXPERTS REWRITE AMERICA'S MOST CONTROVERSIAL DECISION, 109, 111 (Jack M. Balkin ed., 2005)); Moss & Raines, *supra* note 88, at 189.

[142] *Id.*

Before *Dobbs*, the Establishment Clause also had garnered interest as a potential limitation upon abortion restrictions.[143]  Under this theory, closely held beliefs about when life begins and the relative value of potential life balanced against the health of the pregnant woman are to a large extent informed by one's religious views.[144]  The Establishment Clause argument suggests that the state's interest in protecting fetal life advanced by abortion restrictions is susceptible to being rejected as an endorsement of a particular religious tenet or philosophy.[145]  As I have noted elsewhere, under prevailing Supreme Court jurisprudence, the Free Exercise Clause has in many ways swallowed the Establishment Clause.[146]  Nonetheless, considerable persuasive force remains in the

---

[143]  Gray, *supra* note 70, at 417 ("The establishment clause line of reasoning affords a superior basis for allowing individual free choice in abortion decisions than the right to privacy argument.").

[144]  *See supra*, note 74.

[145]  Gray, *supra* note 70, at 417-18 ("Empirical proof establishes that: (1) the general public views the issue as a religious one; (2) no consensus exists in other disciplines supplying a nonreligious ground for the alleged religious endorsement; (3) the challenged view is aligned with a particular religious belief; and (4) the government enacts abortion statutes so based upon the legislators' own religious beliefs or pressure from the groups aligned with religiously motivated, anti-abortion beliefs.") (footnotes omitted).

[146]  David N. Wecht, *Majoritarianism Run Riot: Christian Supremacism and the Religion Clauses*, 58 GONZAGA L. REV. 93 (2023) (reviewing *Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067, 2089 (2019) (using history and tradition to insulate the Bladensburg Cross from an Establishment Clause challenge); *Shurtleff v. City of Boston*, 142 S.Ct. 1583, 1593 (2002) (rejecting a challenge to a crucifix flag in front of city hall under the Establishment Clause); *Kennedy v. Bremerton Sch. Dist.,* 142 S.Ct. 2407, 2433 (2022) (approving of public prayer by a public school football coach on the public school football field against an Establishment Clause challenge); and *Town of Greece v. Galloway*, 572 U.S. 565, 591-92 (2014) (approving of sectarian Christian prayers at government meetings)).

argument that religiously infused state interests supporting abortion restrictions are "wholly illegitimate" as a violation of the Establishment Clause.[147]

Prior to *Roe*, and in an *amicus* brief filed in *Roe*, advocates relied in part upon the Eighth Amendment to inform their understanding of abortion restrictions that carry criminal consequences and threaten cognizable harm to women or to physicians, arguing that "abortion laws inflicted cruel and unusual punishment on women not imposed on men for conduct no longer fairly understood as criminal."[148] Another argument views abortion regulations as takings that demand just compensation under the Fifth Amendment.[149] And yet another argument draws upon *Griswold's* description of marriage as an

---

[147] David R. Dow, *The Establishment Clause Argument for Choice*, 20 GOLDEN GATE U. L. REV. 479, 488 (1990); *see also id*. at 494 ("interests rooted in orthodox religiosity are not even legitimate, and certainly not compelling."); Abigail Sellers, *How the First Amendment's Commitment to Religious Freedom Could Ironically Save* Roe v. Wade…*If We Let It*, 94 S. CAL. L. REV. 691, 718 (2021) (observing that, despite the unsuccessful Establishment Clause challenge in *Harris*, the "time has come for a potentially successful Establishment Clause challenge to a restrictive abortion law"); John Morton Cummings, Jr., *The State, the Stork, and the Wall: The Establishment Clause and Statutory Abortion Regulation*, 39 CATH. U. L. REV. 1191, 1193 (1990) (suggesting that statutory abortion restrictions "lack a secular purpose, benefit specific religious organizations, unnecessarily entangle church and state, and place the state on one side of a political issue which is divided along religious lines, thus violating the establishment clause").

[148] Siegel, *supra* note 63, at 824. The *Amicus Curiae* Brief in *Roe* asserted that "[s]uch punishment involves not only an indeterminate sentence and a loss of citizenship rights as an independent person . . . [and] great physical hardship and emotional damage 'disproportionate' to the 'crime' of participating equally in sexual activity with a man . . . but is punishment for her 'status' as a woman and a potential child-bearer." Brief of *Amicus Curiae* on Behalf of New Women Lawyers *et al*. at 24, *Roe*, 410 U.S. 113.

[149] *See* Nicole Knight, *American Motherhood—A Taking*, 43 MITCHELL HAMLINE L.J. PUB. POL'Y & PRAC. 162 (2022); Rebecca L. Rausch, *Reframing* Roe: *Property over Privacy*, 27 BERKELEY J. OF GENDER L. & JUST. 28 (2012); Susan E. Looper-Friedman, *"Keep Your Laws Off My Body": Abortion Regulation and the Takings Clause*, 29 NEW ENG. L. REV. 253, 256 (1995); Jeffrey D. Goldberg, *Comment, Involuntary Servitudes: A Property-Based Notion of Abortion-Choice*, 38 U.C.L.A. L. REV. 1597, 1609-12 (1991).

association to ground a right to reproductive privacy in the First Amendment's freedom of intimate association.[150]

I offer no judgment on these arguments, some of which strike me as more persuasive than others. Shifting the right to have an abortion from substantive due process will require the advancement of novel legal theories and the abrogation of substantial precedent. The Supreme Court that overturned *Roe* might not be open to alternative arguments which maintain that the right that *Roe* protected is located elsewhere in the Constitution. I merely observe that, in the wake of *Dobbs*, litigants have the opportunity to craft what may prove to be better arguments than the rickety analysis upon which *Roe* landed. This journey will be neither quick nor easy.

## V. State Constitutional Law

Prior to *Dobbs*, the right to abortion articulated in *Roe* protected women from unduly burdensome interference with the freedom to make their own decisions. Because this right was established as a matter of federal law, there was no cause to resolve the extent to which a state constitution independently protects reproductive autonomy. Now that this federal floor has been demolished, states have a fresh opportunity to resolve with renewed vigor claims of equality and reproductive autonomy that are untethered to any possible limitations imposed by the federal constitution.[151] This court's interpretation of our organic charter does not rely in any respect upon the tenuous hook of federal substantive due process in particular or upon the federal constitution more generally.

---

[150]    Kenneth L. Karst, *The Freedom of Intimate Association*, 89 YALE L.J. 624, 641 (1980) ("Coerced intimate association in the shape of forced childbearing or parenthood is no less serious an invasion of the sense of self than is forced marriage or forced sexual intimacy.").

[151]    *See* Providers' Supplemental Brief at 1-4 (arguing that, in the wake of *Dobbs*, "this Court's role in protecting the right to abortion under our state constitution takes on new importance").

As the Majority develops, Article I, Section 1's broad protections for individual rights protect a woman's right to decide whether to continue a pregnancy.[152]  Indeed, bodily autonomy is so essential to the foundational concept of liberty that it is hard to imagine any liberty that is more fundamental than the right to make decisions about one's own body.  In this respect, the guarantee of reproductive autonomy is a safeguard against tyranny.  Without this guarantee,

> the state would become omnipresent: It would be in its subjects' values, beliefs, opinion, worldviews, politics, and so forth. If the state is present in its subjects' minds and hearts—indeed, if the state forms its subjects' minds and hearts—the state, in very important ways, would form the institutions in civil society that individuals create. . . .  And if the state forms the institutions of civil society, this is totalitarianism.[153]

Although state control over the bodies of women and over the intimate decisions of families may not strike one as problematic if one's conscience aligns with the interests advanced by the state, this discrete and momentary alignment is no protection against the state shifting its target.  Empowering the state to direct and occupy the lives of individuals in ways that serve our personal interests also empowers the state to direct and occupy our lives in ways that do not.

The right to reproductive autonomy anchored in Article I, Section 1 may also be supported by other provisions in our Constitution, including the ERA itself and Article I, Section 3.  The Majority correctly foreshadows this possibility, linking the right to reproductive autonomy in Article I, Section 1 to the ERA and observing that equality would mean little if women did not possess autonomy over their own destinies.[154]

---

[152]   Maj. Op. at 132-168.

[153]   Khiara M. Bridges, THE POVERTY OF PRIVACY RIGHTS 104 n.1 (Stanford Law Books, 1st ed. 2017).

[154]   Maj. Op. at 165.

As federal equal protection was sidelined as a basis of reproductive autonomy in favor of substantive due process, equality began to emerge as the dominant rationale to protect abortion access in the states.[155]  The Majority's overview of the history leading up to the adoption of the ERA in the Commonwealth and the intent of its supporters demonstrates that the ERA's express guarantee provides fertile ground to recognize the right to abortion as a matter of sex equality.  Although Providers are not arguing that the right to reproductive autonomy rests upon the ERA, focusing instead upon Article I, Section 1, the ERA may provide independent authority requiring courts to strike down abortion related restrictions that perpetuate gender-based inequality.[156]

Under our ERA, legislative sex-based classifications presumptively are unconstitutional.[157]  As we stated unequivocally in *Henderson v. Henderson*,

> [t]he sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.[158]

---

[155]  *See, e.g., Maher*, 515 A.2d at 159; *New Mexico Right to Choose*, 985 P.2d at 852-55.

[156]  *See, e.g.*, Grace Kavinsky, *Comment, An Opportunity for Feminist Constitutionalism*, 75 STAN. L. REV. 1209, 1221 (2023) (advocating for states to adopt a new abortion right, one based upon the express guarantees of sex equality that "lies untapped in many state constitutions in the form of an equal rights amendment. . .").

[157]  Maj. Op. at 123.

[158]  327 A.2d 60, 62 (Pa. 1974) (invalidating a statutory scheme awarding alimony *pendente lite* and counsel fees only to wife and not husband); *see also Spriggs*, 368 A.2d at 639-40 (plurality) (questioning the legitimacy of the tender years doctrine as predicated upon "traditional or stereotypic roles of men and women in a marital union" and being offensive to the equality of the sexes); *Adoption of Walker*, 360 A.2d 603, 605 (Pa. 1976) (invalidating statutory distinction between unwed mothers and unwed fathers); *Butler v. Butler*, 347 A.2d 477, 480 (Pa. 1975) (invalidating a presumption that, where a husband obtains his wife's property without adequate consideration, a trust is created in the wife's favor); *Commonwealth v. Santiago*, 340 A.2d 440, 445-46 (Pa. 1975) (invalidating the (continued…)

The state may not rebut the presumption of unconstitutionality if the legislative enactment perpetuates traditional gender stereotypes. [159]

There is ample support in the ERA to go beyond invalidating explicit gender-based distinctions to also invalidate laws and policies that operate to perpetuate sex-based inequality. As we have recognized, "[t]he thrust of the Equal Rights Amendment is to insure [*sic*] equality of rights under the law . . . ."[160] When we talk about reproductive autonomy, what is really at stake is the prospect of equal citizenship. Although federal jurisprudence has done little to recognize reproductive autonomy as an issue of equality, it is apparent that equality is illusory without the ability to control one's body, including one's reproductive decisions. As Justice Ginsburg tirelessly articulated, equality demands "woman's autonomy to determine her life's course, and thus to enjoy equal citizenship stature."[161] Being empowered under the law to determine the timing of

---

presumption under the common law concept of coverture that presumed that a married woman, committing a crime in her husband's presence, was an unwilling participant); *DiFlorido v. DiFlorido*, 331 A.2d 174, 180 (Pa. 1975) (holding that property acquired in anticipation of or during marriage and which has been possessed and used by both spouses will, in absence of contrary evidence, "be presumed to be held jointly by the entireties."); *Commonwealth v. Butler*, 328 A.2d 851, 85-57 (Pa. 1974) (invalidating statutory parole eligibility for women but not men); *Hopkins v. Blanco*, 320 A.2d 139, 140 (Pa. 1974) (affording equal treatment of loss of consortium claims brought by husbands and wives); *Conway v. Dana*, 318 A.2d 324, 326 (Pa. 1974) (refusing to follow the presumption that the father must bear the principal burden of financial support for couple's children).

[159] *Hartford*, 482 A.2d at 548 ("[W]e have not hesitated to effectuate the [ERA]'s prohibition of sex discrimination by striking down statutes and common law doctrines 'predicated upon traditional or stereotypic roles of men and women.'") (quoting *Spriggs*, 368 A.2d at 639); *DiFlorido*, 331 A.2d at 180 (validating the equal financial contributions of both spouses in a marriage).

[160] *Henderson*, 327 A.2d at 62.

[161] *Gonzales*, 550 U.S. at 172 (Ginsburg, J., dissenting); *see also* Ginsburg, *supra* note 116 (arguing that grounding the right to abortion in equal protection, rather than substantive due process, would not have prompted such social opposition and backlash); (continued…)

motherhood protects a woman's status as an equal citizen by affording her autonomy over her sexuality, her relationships, her education, her career, her family, and her life.[162] This remedial purpose is served by invalidating legislative schemes that may appear neutral on their face but operate in fact in a discriminatory manner.[163] In this respect, the ERA can be read as barring the government from singling out and targeting the reproductive health choices of women.

---

Ruth Bader Ginsburg, *Speaking in a Judicial Voice*, 67 N.Y.U. L. Rᴇᴠ. 1185, 1200 (1992) (opining that *Roe* should have focused "on the women's equality dimension of the issue. . . ."). Although Justice Ginsburg understood abortion rights as a matter of equality, the Court majority continued to view challenges to abortion restrictions through the lens of substantive due process.

[162]   As explained by Kathryn Kolbert and David H. Gans,

> Singling out abortion services for proscription or special regulation violates the core meaning of equality: it singles out women for adverse treatment. Because only women obtain abortions, the direct impact of abortion restrictions falls on a class composed only of women, while men are able to protect their health and exercise their pro-creative choices free of governmental interference. Restrictive legislation coerces only women to continue their pregnancies to term. Only women bear the harmful consequences of dangerous, illegal abortions, where the state has made safe, legal abortions unavailable.

*Responding to Planned Parenthood v. Casey: Establishing Neutrality Principles in State Constitutional Law*, 66 Tᴇᴍᴘ. L. Rᴇᴠ. 1151, 1167 (1993).

[163]   *See, e.g., DeFlorido* 331 A.2d at 179 (invalidating a facially neutral policy in favor of one that would "acknowledge the Equally important and often substantial nonmonetary contributions made by either spouse"); *Kemether v. Pa. Interscholastic Athletic Ass'n*, 1999 WL 1012957, at *20 (E.D. Pa. 1999) (finding a violation of the ERA where a law purported to treat men and women equally but had the effect of perpetuating discriminatory practices and unfairly burdening women); *see also* Hon. Phyllis W. Beck & Patricia Daly, *Prohibition Against Denial or Abridgement of Equality of Rights Because of Sex*, Tʜᴇ Pᴇɴɴsʏʟᴠᴀɴɪᴀ Cᴏɴsᴛɪᴛᴜᴛɪᴏɴ: A Tʀᴇᴀᴛɪsᴇ ᴏɴ Rɪɢʜᴛs ᴀɴᴅ Lɪʙᴇʀᴛɪᴇs, § 30.1, 708 (Ken Gormley & Joy G. McNally eds. 2nd ed. 2020) (observing that the courts of this Commonwealth have recognized that the ERA triggers "a comprehensive eradication of gender bias" and provides "protections far more extensive than afforded by the federal law.").

As the Majority observes, our own Pennsylvania Constitution was amended to protect against sex discrimination at a time when the country as a whole was debating the federal equal rights amendment.[164] Though ultimately unsuccessful, this federal effort was the impetus for considering state equal rights amendments across the nation and for the adoption of the ERA in Pennsylvania.[165] Federal proponents believed that women were relegated to an inferior social position and were exploited or were prevented from realizing their full potential.[166] These proponents sought an equal rights amendment at the federal level because of dissatisfaction with the Supreme Court of the United States' treatment of claims of sex-based discrimination under the federal Equal Protection Clause.[167] Federal opponents, on the other hand, made the case that sex equality implicated a right to abortion.[168] As the debates about the federal ERA evolved, reforming criminal abortion laws became a central focus of the debate, driven by arguments of equality. This constitutional dialogue led to the birth of Pennsylvania's ERA in 1971.

At the time that our Constitution was amended to protect equality of the sexes in 1971, classifications that disadvantaged women on the basis of pregnancy were already considered sex discrimination. The Pennsylvania Human Relations Commission

---

[164] Maj. Op. at 87, 90-91.

[165] Beck & Daly, *supra* note 163, at § 30.2, 709.

[166] *Id*.

[167] Maj. Op. at 90-91.

[168] Siegel, *supra* note 63, at 828 ("Paradoxically, throughout the 1970s and into the early 1980s, it was the ERA's opponents rather than its proponents who were most likely to assert that abortion was a sex equality right."); Reva B. Siegel, *Constitutional Culture, Social Movement Conflict and the Constitutional Change: The Case of the De Facto ERA*, 94 CALIF. L. REV. 1323, 1390 (2006) ("[Phyllis] Schlafly linked together the ERA, abortion, and homosexuality in ways that changed the meaning of each, and mobilized a grassroots, 'profamily constituency' to oppose this unholy trinity.").

disseminated Guidelines on Discrimination Because of Sex in 1970 and construed the Human Relations Act's bar on sex discrimination to include discrimination against employees who took time away from work due to childbirth.[169]  We validated those guidelines in *Cerra*, holding that pregnancy discrimination is "sex discrimination pure and simple."[170]

In the aftermath of the adoption of the ERA, this Court immediately heeded its call to enshrine equality of the sexes by equalizing the availability of loss of consortium claims between husbands and wives based upon the understanding of marriage as an equal partnership.[171]  In *DeFlorido*, after eliminating the common law presumption that all property acquired during a marriage is owned by the husband, the Court was faced with the lower court's adoption of an alternative method of determining ownership according to who paid for the property.[172]  Although that approach appeared facially neutral, the Court looked deeper and determined that it was discriminatory as applied because it "would fail to acknowledge the [e]qually important and often substantial nonmonetary contributions made by either spouse."[173]  This jurisprudence recognizes that the ERA may reach beyond legislation that explicitly treats men and women differently and require judicial scrutiny of laws that perpetuate sex-based inequality while appearing neutral.

---

[169]    Pa. Human Relations Comm'n, Guidelines on Discrimination Because of Sex, 1 (24) Pa. Bull. 707-08 (Dec. 19, 1970); *see also* Maj. Op. at 75.

[170]    299 A.2d at 280.

[171]    *Hopkins*, 320 A.2d 139, 140 (rejecting the disparate treatment of loss of consortium claims as having "no rational or proper foundation at law" because "husband and wife are equal partners in the marital relationship, and, as such, should be treated equally under the law with respect to that relationship").

[172]    331 A.2d at 179-80.

[173]    *Id*. at 179.

At the time that Pennsylvanians were considering the ERA, the Supreme Court of the United States was interpreting the federal Constitution anemically, in a manner that did not effectively rectify sex discrimination. In particular, the Supreme Court requires state action, imposes a formal model of equality, applies intermediate rather than strict scrutiny, and is unwilling to examine disparate impact.[174] In each respect, the ERA has the capacity to provide broader protections than federal equal protection. Whatever limitations the Supreme Court perceives in the federal Equal Protection Clause, those have no bearing upon our interpretation of our own ERA.

Because the U.S. Supreme Court has limited the promise of equal protection by requiring state action, it provides no protection against discrimination that occurs in the private spheres of civil society and within the family.[175] There is no such requirement under the ERA. "The rationale underlying the 'state action' doctrine is irrelevant to the interpretation of the scope of the Pennsylvania Equal Rights Amendment, a state constitutional amendment adopted by the Commonwealth as part of its own organic

---

[174] Linda J. Wharton, *State Equal Rights Amendments Revisited: Evaluating Their Effectiveness in Advancing Protection Against Sex Discrimination*, 36 RUTGERS L.J. 1201, 1205 (2005) (observing that several factors have limited the scope of protection available under the Equal Protection Clause: "(1) the requirement of state action; (2) the failure of the Supreme Court to subject claims of sex discrimination to the 'strict scrutiny' standard of review applied to claims of race discrimination; (3) the Supreme Court's application of a formal equality model of analysis that further reduces the protection afforded claims of sex discrimination when men and women are deemed not similarly situated; and (4) the unwillingness of the Supreme Court, based proof of intentional discrimination, to closely scrutinize facially neutral governmental regulations or policies that disparately impact women").

[175] *See, e.g., Shelly v. Kraemer*, 334 U.S. 1, 13 (1948) ("Since the decision of the Court in the *Civil Rights Cases*, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action that may fairly because said to be that of the States. That Amendment erects no shield against merely private conduct."); *Civil Rights Cases*, 109 U.S. 3, 11 (1883).

law."[176]   Rather than adhering to federal precepts, this Court looked to the language of the ERA.   *Hartford* suggests that "Pennsylvania ERA protections against gender discrimination are greater than those protections typically provided in federal cases requiring state action."[177]

In addition, the United States Supreme Court has developed an understanding similar to *Fischer*'s conception of "physical characteristics unique to one sex"[178] that was grounded upon what Professor Reva Siegel has termed "physiological naturalism": the idea that reproduction is a physiological process divorced from judgments about social roles and that it is therefore permissible to regulate reproduction through the female body.[179]   The requirement of formal equality premised upon physiological naturalism

---

[176]   *Hartford*, 482 A.2d at 586 (rejecting the argument that a claim under the ERA requires state action); *see also Welsch v. Aetna Insurance Co.*, 494 A.2d 409, 412 (Pa. Super. 1985) (extending the rationale of *Hartford* to claims brought directly against insurance companies).

[177]   Beck & Daly, *supra* note 163, at § 30.3, 715.

[178]   *Fischer*, 502 A.2d at 125.

[179]   *See* Reva Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 19th Amend. Ed.,108 GEO. L. J. 167, 189 n.127 (2020) ("[A]ccording to the logic of physiological naturalism, because reproductive differences are objective, real, and categorically distinguish the sexes, (1) judgments about pregnancy are free of stereotypes and constitutionally suspect assumptions about social roles and (2) laws imposing unique burdens on one sex are reasonable."); Reva Siegel, *Reasoning From the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 STAN. L. REV. 261, 265 (1992) (describing the tendency of the courts to address "reproduction as if it were primarily a physiological process" and to evaluate "its regulation in terms focused on the female body" as "physiological naturalism"); *see also Michael M. v. Superior Court*, 450 U.S. 464, 469 (1981) (Stewart, J., concurring) (opining that, although gender classifications may violate the federal constitution, "they do not always do so, for the reason that there are differences between males and females that the Constitution necessarily recognizes"); *id*. at 498 n.4 (Stevens, J., dissenting) ("In cases involving discrimination between men and women, the natural differences between the sexes are sometimes relevant. . . . [I]f, as in this case, there is an apparent connection
(continued…)

under the Equal Protection Clause insulated from heightened scrutiny any legal burdens imposed upon women as a result of biological differences between the sexes. This framing, in turn, led to the Court's failure to understand laws discriminating on the basis of pregnancy as a form of sex discrimination. In *Geduldig*, the Court upheld an insurance plan that provided benefits for all work-disabling conditions except pregnancy, refusing to consider the classification as sex-discrimination because "[n]ormal pregnancy is an objectively identifiable physical condition with unique characteristics."[180] As Professor Siegel has argued, "this mode of reasoning about reproductive regulations obscures the possibility that such regulation may be animated by constitutionally illicit judgments about women."[181]

Reviewing claims of sex discrimination through a lens of formal equality that affords protection against sex discrimination only when men and women are similarly situated sets men as the standard by which women (and equality) are measured, allowing women to claim equality only to the extent that they are just like men.[182] By making men the constitutional standard by which women are measured, this approach disavows

between the discrimination and the fact that only women can become pregnant, it may be appropriate to presume that the classification is lawful.").

[180]   417 U.S. at 496 n.20; *see also Cleveland Bd. of Educ. v. LaFluer*, 414 U.S. 632 (1974) (applying rational basis review to a mandatory maternity leave policy that forbade teachers from working after their fourth or fifth month of pregnancy); *see also Harris*, 448 U.S. 297 (holding that the federal restriction contained in the Hyde Amendment was not predicated upon a constitutionally suspect class); *Maher*, 432 U.S. 464 (state restrictions on abortion funding involve no discrimination against a suspect class).

[181]   Siegel, *supra* note 182, at 264.

[182]   *See* Law, *supra* note 116, at 1007 ("But pregnancy, abortion, reproduction, and creation of another human being are special—very special. Women have these experiences. Men do not. An equality doctrine that ignores the unique quality of these experiences implicitly says that women can claim equality only insofar as they are like men. Such a doctrine demands that women deny an important aspect of who they are. Such a doctrine is, to say the least, reified.").

equality. Without an understanding of equality that includes, rather than excepts, physical characteristics unique to one sex, reproductive capabilities would continue to justify disparate treatment of men and women. In *Geduldig* and elsewhere,[183] the Supreme Court's focus upon formal equality has obscured and immunized the myriad ways in which women are treated unequally precisely because of their unique physical characteristics.[184] Contrary to federal equal protection jurisprudence, the ERA recognizes that women's reproductive capabilities inherently are sex-based characteristics.[185]

The Supreme Court also limits the reach of the federal guarantee of equal protection through its standard of judicial review. Claims of racial classifications under

---

[183] *See Michael M.*, 450 U.S. at 468-69 (plurality) (extending *Geduldig* to uphold sex-based classifications based upon the capacity to become pregnant).

[184] As it evolved, the Supreme Court's sex discrimination jurisprudence briefly began to recognize that physical differences between the sexes may only justify discriminatory laws that compensate one sex for the inequities that sex historically has suffered. In *U.S. v. Virginia*, the Supreme Court declared that "inherent differences" between men and women could not be used to denigrate either sex or "for artificial constraints on an individual's opportunity." 518 U.S. 515, 533-34 (1996). Rather,

> [s]ex classifications may be used to compensate women for particular economic disabilities they have suffered, to promote equal employment opportunity, to advance full development of the talent and capacities of our Nation's people. But such classifications may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women.

*Id*. This recognition that sex-based classifications based upon biological differences deserved close scrutiny was short-lived. In *Nguyen v. INS*, 533 U.S. 53 (2001), the Court upheld a law distinguishing between parents based on sex, and, according to Justice Sandra Day O'Connor, further watered-down intermediate scrutiny by perpetuating stereotypes masquerading as biological differences. *Id*. at 78-79 (O'Connor, J., dissenting).

[185] *See* Maj. Op. at 88-89.

the Equal Protection Clause are reviewed through strict scrutiny, which requires the government to establish that racial classifications are necessary to advance a compelling governmental interest.[186]  At the same time, the Court has turned down every invitation to subject sex-based distinctions to strict scrutiny.[187]  And it was not until 1976 that the Supreme Court adopted intermediate scrutiny for sex-based classifications, requiring the government to establish that the sex-based classification substantially advances important governmental objectives.[188]  Under this standard, the government does not have to prove that it has compelling objectives or that less discriminatory alternatives are unavailable.  As it has developed, intermediate scrutiny has proven difficult to apply and has done little to afford sufficient guidance in particular circumstances to connect a purported important government interest to a challenged sex-based classification.[189]  Rather than leading to the relatively more predictable outcomes of strict scrutiny and rational basis review, intermediate scrutiny instead delivers malleable, unpredictable

---

[186]     *See, e.g., Johnson v. California*, 543 U.S. 499, 505 (2005).

[187]     *See Frontiero*, 411 U.S. at 682 (plurality) (opining that sex-based classifications "are inherently suspect and must therefore be subjected to close judicial scrutiny"); *id*. at 691 (Powell, J., concurring in the judgment) (refusing to provide a fifth vote to apply strict scrutiny to sex-based classifications).

[188]     *See Craig*, 429 U.S. at 197 ("classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives").

[189]     *See, e.g., Craig,* 429 U.S. at 221 (Rehnquist, J., dissenting) (opining that the test of intermediate scrutiny is "so diaphanous and elastic as to invite subjective judicial preferences or prejudices relating to particular types of legislation, masquerading as judgments"); *Contractors Ass'n of Eastern Pa., Inc. v. City of Phila.,* 735 F.Supp. 1274, 1303 (E.D.Pa. 1990) (observing that intermediate scrutiny provides "relatively little guidance in individual cases," and that the three-tiered scrutiny "provides the court with 'buzz words'—i.e. 'compelling state interest,' 'important governmental interest' and 'rational basis'"—that in practice are at times both difficult to distinguish and to apply") (citations omitted); *aff'd in part and vacated in part*, 945 F.2d 1260 (3d Cir. 1991).

results that have done little to root out and rectify sex-based classifications as highly suspect under the law.[190]

In the years after the adoption of the ERA, this Court interpreted the ERA expansively, and we robustly extended its protection of sex equality beyond that afforded at the federal level.[191] Before *Fischer*, the ERA had always been understood as establishing an absolute ban on sex-based classifications,[192] and the Majority's adoption of strict scrutiny for sex-based distinctions returns our jurisprudence to that understanding.[193] It is a reset, placing the development of the law back on the track it was on before *Fischer*.

The federal equal protection argument against abortion restrictions is grounded less upon asserting that restricting abortion intentionally discriminates against women and more upon asserting that such laws negatively impact women. Under the federal Constitution, laws that merely have a disparate impact on a particular group are

---

[190] *See* Wharton, *supra* note 174, at 1213 (reviewing an argument by Professor Deborah Brake that "the history of intermediate scrutiny in the lower courts demonstrates widespread confusion and inconsistent results").

[191] *See* Maj. Op. at 120, 123.

[192] Maj. Op. at 93-98; *see also Hartford*, 482 A.2d at 548; *Spriggs*, 368 A.2d at 639 (plurality); *Walker*, 360 A2d at 605; *Butler*, 347 A.2d at 480; *Commonwealth v. Santiago*, 340 A.2d 440, 445-46 (Pa. 1975); *DiFlorido*, 331 A.2d at 180; *Henderson*, 327 A.2d at 62; *Commonwealth v. Butler*, 328 A.2d 851, 855-57 (Pa. 1974); *Conway*, 318 A.2d at 326; *Hopkins*, 320 A.2d at 140.

[193] Although the Majority does not designate its approach as strict scrutiny, I understand the searching judicial inquiry that it articulates to be just that. As the Majority describes it, "[i]t is the government's burden to rebut the presumption [of unconstitutionality] with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support that expressed policy." Maj. Op. at 123.

permissible and beyond the reach of the Equal Protection Clause.[194]   In *Personal Administrator of Massachusetts v. Feeney*, for example, the Court rejected a challenge to a state policy that afforded lifetime hiring preferences in state civil service to veterans, ninety-eight percent of whom were men.[195]   Even though this policy overwhelmingly operated to the advantage of men and to the disadvantage of women, the Court relied upon its facial neutrality and the lack of any indication that the policy was the result of intentional, invidious gender discrimination to uphold it against an equal protection challenge.[196]

In *DiFlorido,* this Court extended scrutiny under the ERA to laws and policies that are facially neutral but that disproportionally impact men or women.[197]   After we invalidated the common-law rule that would have made household goods acquired during a marriage presumptively the property of the husband, we invalidated the trial court's alternative sex-neutral presumption that the owner is the spouse that purchased the property.  Such a presumption "would fail to acknowledge the equally important and often substantial non-monetary contributions made by either spouse."[198]   The Court chose instead to presume that household goods acquired during the marriage are held jointly

---

[194]   *See, e.g, Washington v. Davis*, 426 U.S. 229, 239 (1976) (reviewing one hundred years of precedent to conclude that "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional [s]olely because it has a racially disproportionate impact").

[195]   442 U.S. 256, 280-81 (1979).

[196]   *Id*. at 259, 274, 279 (holding that the requirement that the policy evince a discriminatory purpose requires that the decisionmaker chose a course of action "because of, not merely in spite of, its adverse effects upon an identifiable group").

[197]   331 A.2d 174.

[198]   *Id*. at 179.

by both spouses.[199]  Applying Pennsylvania law, a federal court followed course and sustained a jury verdict premised upon a disparate impact claim under the ERA.[200]

Perhaps the reason that the federal Equal Protection Clause of the Fourteenth Amendment has proven unable effectively to redress gender discrimination and inequality is that it was never intended to do so.  Before she became a Justice on the United States Supreme Court, Ruth Bader Ginsburg opined that the Fourteenth Amendment was necessary to redress racial discrimination apparent during Reconstruction and was intended to enshrine constitutional protection for formerly enslaved men.[201]  There is, of course, a counterargument which posits that the framers of the Fourteenth Amendment sought to ensure true freedom and to redress the subjugation of the formerly enslaved by affording the basis for the right of bodily autonomy.[202]  But without finding a historical basis for gender equality in the Fourteenth Amendment, the Supreme Court has demonstrated a reluctance to construe the Equal Protection Clause as promising gender equality.  This is particularly so following the reasoning of *Geduldig,* which divorced claims

---

[199]     *Id*. at 179-80.

[200]     *Kemether*, 1999 WL 1012957 at *20 (expressly rejecting the defendant's claim that the ERA did not extend to facially neutral policies: "While a practice may purport to treat men and women equally, if it has the effect of perpetuating discriminatory practices, thus placing an unfair burden on women, it may violate the ERA").

[201]     *See* Ruth Bader Ginsburg, *Sexual Equality Under the Fourteenth and Equal Rights Amendments*, 1979 WASH. U. L. Q. 161, 161 (1979) (recognizing that "the framers of the fourteenth amendment did not contemplate sex equality").

[202]     David H. Gans, *No, Really, the Right to an Abortion Is Supported by the Text and History of the Constitution*, THE ATLANTIC (Nov. 4, 2021), https://www.theatlantic.com/ideas/archive/2021/11/roe-was-originalist-reading-constitution/620600 (last viewed July 17, 2023) ("The right of 'having a family, a wife, children, home,' as Senator Jacob Howard, who played a central role in drafting the Fourteenth Amendment, put it, guarantees to the individual free choice in matters of family and childbirth, in the same way that the freedom of speech also includes the right to not speak.").

of discrimination on the basis of pregnancy from claims of discrimination on the basis of sex.

Against this historical backdrop, the ERA can be understood as a mandate from Pennsylvania voters to do better. Rather than waiting for federal judicial opinions to catch up to popular will or for the states to ratify the federal Equal Rights Amendment, the people of this Commonwealth elevated to constitutional magnitude the guarantee of equality on the basis of sex that depends in no respect upon federal precedent.[203]

I therefore agree that a presumption of unconstitutionality for laws based upon distinctions between sexes is the appropriate starting point to analyze the Coverage Exclusion, for the reasons set out by the Majority. My agreement in this respect does not foreclose my openness to considering other ways to effectuate the promise of the ERA. Scholars have long proposed various approaches under state equal rights amendments, some of which may warrant consideration by this Court in future cases.[204] For example, Professor Reva Siegel has argued that "courts can enforce equal citizenship values by evaluating restrictions on reproductive decision making to ensure that such restrictions do not reflect or enforce gender stereotypes about women's agency and their sexual and

---

[203] Other states have recognized the same effect of their own equal rights amendment. For example, the Washington Supreme Court has said of its state's ERA:

> Presumably the people in adopting [the ERA] intended to do more than repeat what was already contained in the otherwise governing constitutional provisions, federal and state. Any other view would mean the people intended to accomplish no change in the existing law. Had such a limited purpose been intended, there would have been no necessity to resort to the broad, sweeping, mandatory language of the [ERA].

*Darrin v. Gould*, 540 P.2d 882, 889 (Wash. 1975).

[204] *See* Kavinsky, *supra* note 156, at 1231 (reviewing a few approaches to enforce constitutional sex equality).

family roles."[205]  In this vein, laws that constrain the reproductive freedom of women are sex discrimination because they rely upon the premise that biology is destiny, and that the capacity of women to carry and bear children determines their role in society and limits their personal autonomy.

Professor Sylvia Law has proposed that abortion restrictions be scrutinized to ensure that "(1) the law has no significant impact in perpetuating either the oppression of women or culturally imposed sex-role constraints on individual freedom or (2) if the law has this impact, it is justified as the best means of serving a compelling state purpose."[206] Another approach simply focuses upon whether the law or policy perpetuates the inequality of women based upon their reproductive capacity.[207]

Future cases may call upon this Court to examine generally whether the ERA independently protects reproductive autonomy as a matter of equality, or to examine whether specific abortion restrictions codify gender inequality based upon reproductive capacity in violation of the ERA.  In another case, I would be open to considering the argument that there is no equality without access to abortion, and that the ERA requires courts to strike down unsupported restrictions on reproductive autonomy that perpetuate social inequality based upon childbearing capacity, forcing women to become mothers, denying women the right to make decisions to shape their own future, or enforcing

---

[205]  Siegel, *supra* note 63, at 824.

[206]  *See* Law, *supra* note 116, at 1007.

[207]  Kavinsky, *supra* note 156, at 1231.  Under this view, abortion restrictions are unconstitutional because they limit the ability of pregnant individuals to decide for themselves whether to end the pregnancy, creating "a social and economic underclass based on the ability to bear children."  *Id*. at 1232.

stereotypes that a woman's primary function is to beget and bear children.[208]  The ERA will continue to evolve beyond what this case demands.

I also observe the role that Pennsylvania's guarantee of religious freedom and freedom of conscience may play in evaluating limitations upon laws restricting reproductive autonomy.  Article I, Section 3 provides that:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; no man can be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.[209]

These provisions reflect our founders' view of religious tolerance.  Where the Establishment and Free Exercise Clauses of the First Amendment are tied to religion, Article I, Section 3 expressly extends to the more sweeping realm of "conscience."  One's freedom of conscience includes concepts of morals and ethics that lay beyond the structures of established religions.  Article I, Section 3 therefore exceeds the limitations of the First Amendment, in both breadth and emphasis.[210]  Construed broadly, Article I, Section 3 may support arguments that freedom of conscience prevents the state from

---

[208]    Catharine MacKinnon, *Reflections on Sex Equality Under the Law*, 100 YALE L. J. 1281, 1319 (1991) ("Forced motherhood is sex inequality.  Because pregnancy can be experienced only by women, and because of the unequal social predicates and consequences pregnancy has for women, any forced pregnancy will always deprive and hurt one sex only as a member of her gender.  Just as no man will ever become pregnant, no man will ever need an abortion, hence be in a position to be denied one by law.  On this level, only women can be disadvantaged, for a reason specific to sex, through state-mandated restrictions on abortion.").

[209]    PA. CONST. art. 1, § 3.

[210]    *See State v. Herchberger*, 462 N.W.2d 393, 397 (Minn. 1990) (construing a freedom of conscience provision in the Minnesota Constitution virtually identical to ours and concluding that it is broader and stronger than the religion clauses of the federal Constitution).

interfering in decisions that involve deeply held moral and ethical views, particularly when such decisions will have a profound effect on the individual's life. To the extent that convictions of conscience and religion inform personal views on reproductive choices, freedom of conscience may protect a woman's freedom to act in accord with her own moral and ethical views and to make her own decisions.

## VI. History and Tradition

In its historical review of the law's treatment of women prior to the enactment of the ERA,[211] and in its review of reproductive autonomy in Pennsylvania,[212] the Majority contextualizes the ERA and the common law criminalization of abortion in Pennsylvania. I agree with the Majority's historical recitation. Unlike the United States Supreme Court in *Dobbs*, the Majority in this case recognizes that we cannot examine particular laws in their historical context without also examining the society in which those laws developed.

For fifty years, *Roe* guaranteed a qualified federal right to abortion.[213] *Roe* also held that the state has an interest in "potential life which may be destroyed."[214] In *Casey*, the Court struck a balance between these interests, protecting the freedom of pregnant women to terminate their pregnancies without unduly burdensome interference by the state.[215]

---

[211] Maj. Op. at 87-91.

[212] *Id*. at 146-153.

[213] *Roe*, 410 U.S. at 153 (holding that the Due Process Clause of the Fourteenth Amendment protected "a woman's decision whether or not to terminate her pregnancy"); *see also Casey*, 505 U.S. at 860 (plurality) (affirming *Roe*'s guarantee of "the constitutional liberty of the woman to have some freedom to terminate her pregnancy").

[214] *Roe*, 410 U.S. at 162.

[215] *Casey*, 505 U.S. at 878 ("An undue burden exists, and therefore a provision of the law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.").

In 2022, the Supreme Court of the United States overruled *Roe* and *Casey* and held that the federal constitution confers no right to abortion.[216] The *Dobbs* majority stated without qualification that the Due Process Clause of the Fourteenth Amendment protects unenumerated rights only to the extent that such rights are "deeply rooted in the Nation's history and tradition" and "implicit in the concept of ordered liberty."[217] Applying this test to the right to abortion, the *Dobbs* majority purported to examine the history of abortion legislation from the founding of the nation until 1973 in order to ascertain whether abortion was firmly rooted in the tradition and history of the United States.[218] Although the *Dobbs* majority dwelled on the views of common law theorists like Lord Matthew Hale, the Court grounded its holding on the point in American history surrounding the adoption of the Fourteenth Amendment in 1868, because *Roe* premised the right to abortion on the Due Process Clause of the Fourteenth Amendment.[219] Its historical review convinced the *Dobbs* majority that, at that time, three-quarters of the states prohibited abortion at all stages of pregnancy.[220] Consequently, the Court held that a right to abortion could not be "deeply rooted in this Nation's history and tradition."[221]

---

[216]   *Dobbs*, 597 U.S. at 292 ("We therefore hold that the Constitution does not confer a right to abortion.").

[217]   *Id*. at 231.

[218]   *Id*. at 242-50.

[219]   *Id*. at 231 (because "three quarters of the States made abortion a crime at all stages of pregnancy" at the time "when the Fourteenth Amendment was adopted," the Court concluded that the right to abortion was not "deeply rooted in this Nation's history and tradition").

[220]   *Id*. at 231-32, 260.

[221]   *Id*. at 231.

As explained above, I agree with critics who have characterized the substantive due process underpinnings of *Roe* as "textual gibberish."[222] At the same time, I recognize the strong criticism engendered by the historical survey upon which the Court embarked in order to justify its rejection of a historical right to abortion.[223] Generally speaking, relying upon particular points in history during which women expressly were precluded from political participation effectively enshrines and perpetuates the legal subjugation of women. Under this approach, there is no opportunity for the status of women to advance, and no chance to repudiate the nation's discriminatory history. The nation is locked into the gendered hierarchies of our past.[224]

Rather than examining the history of the Fourteenth Amendment as a Reconstruction Amendment aimed at transforming the formerly enslaved into citizens,[225]

---

[222] *See, e.g.,* Amar, *supra* note 84.

[223] *See, e.g.*, Aaron Tang, *After* Dobbs: *History, Tradition, and the Uncertain Future of a Nationwide Abortion Ban*, 75 STAN. L. REV. 1091, 1099 (2023) (challenging the *Dobbs* Majority's historical analysis); Carole J. Petersen, *Women's Right to Equality and Reproductive Autonomy: The Impact of* Dobbs v. Jackson Women's Health Organization, 45 U. HAW. L. REV. 305, 323 (2023) (collecting various critiques of *Dobbs'* historical analysis); Nancy C. Marcus, *Yes, Alito, There is a Right to Privacy: Why the Leaked Dobbs Opinion is Doctrinally Unsound*, 13 CONLAWNOW 101 (2022) (asserting that *Dobbs* is based upon the "deeply flawed" premise that the right to abortion historically had not been recognized prior to *Roe*); *see also* Siegel, *supra* note 179, at 280-319 (1992) (exploring the reproductive freedom women enjoyed and the medical profession's successful anti-abortion campaign of the nineteenth century).

[224] *See* Melissa Murray, *Children of Men: The Roberts Court's Jurisprudence of Masculinity*, 60 HOUS. L. REV. 799, 800 (2023) ("By its own terms, originalism focuses constitutional interpretation and meaning on certain key historical moments. But tellingly, those constitutional moments on which the Roberts Court frequently relies are moments in which women and people of color were expressly excluded from political participation and deliberation.").

[225] *See* U.S. CONST. amend. XIII, § 1 (abolishing slavery and involuntary servitude); *id*. amend. XIV, § 1 (conferring citizenship and protections for individual rights); *id*. amend. XV, § 1 (enfranchising black men).

the *Dobbs* majority relied upon the patriarchal notions of eminent authorities of old English common law, including Lord Matthew Hale.[226]  Hale, a seventeenth-century English jurist, thought very little of women's rights within marriage or over their own bodies.[227]  Elevating his own opinions over those of the women he sought to constrain, Hale's beliefs were driven by his goal of keeping women from encroaching upon the rights of men.  According to Hale—who presided over the hanging of two women accused of being witches[228]—affording women legally enforceable rights over their own bodies was a threat to the freedom of men.  As an example of this world view, Hale's opinions about rape led to centuries of common law jurisprudence that required rape victims to produce corroborating witnesses or outside evidence to support their claims, and to the belief that marital rape was never a crime because marriage amounted to the wife's (but not the husband's) irrevocable consent to sex.[229]  Hale's view of women was consistent with the

---

[226]    *Dobbs*, 597 U.S. at 242-45, 251, 272.

[227]    *See, e.g.*, Sir Matthew Hale, THE HISTORY OF THE PLEAS OF THE CROWN 635 (P.R. Glazebrook ed. 1971) (1736) (cautioning that rape "is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent"); *id*. at 629 (explaining Hale's belief that a spousal rape could not, by definition, be criminal because it was inconsistent with the husband's right to his wife's body).

[228]    *See* Murray*, supra* 224, at 857 ("Instead of focusing on what the Framers of the Fourteenth Amendment thought and understood when they were drafting the text at issue in *Dobbs*, the *Dobbs* majority's originalism is stubbornly limited to the views of common law theorists like Sir Matthew Hale, who popularized the marital rape exemption and presided over the hanging of two women as witches, and William Blackstone, whose Commentaries on the Laws of England enshrined the principle of coverture that required married women's identities and legal rights to be subsumed under the broader scope of their husbands' identities.") (citing William Renwick Riddell, *Sir Matthew Hale and Witchcraft*, 17 J. CRIM. L. & CRIMINOLOGY 5, 7 (1926)).

[229]    *See* Hale, *supra* note 227 at 629 ("[T]he husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto the husband, which she cannot retract").

law of coverture endorsed by Sir William Blackstone in his Commentaries on the Laws of England.[230]  Under the concept of coverture, a married woman had no individual rights of her own because her rights were thought to be encompassed within her husband's.[231]

Misogyny permeated English common law and became enshrined not only within Britain's legal system but also that of her colonies.  Indeed, at the same time that the *Dobbs* Majority was citing Hale to justify the revocation of a constitutional right, the Delhi High Court relied upon Hale to refuse to criminalize spousal rape.[232]

The history represented by Hale and Blackstone is not, as the *Dobbs* Majority seemed to believe, a neutral survey of history.  It was the continuation of centuries of misogyny and oppression that our society has since rejected.[233]  The historical limitations upon reproductive freedom that the *Dobbs* Majority found reveal the perpetuation of the subjugation of women throughout time, just as today's abortion restrictions reveal the present unequal treatment of women.  Our common law history, of which Hale and Blackstone were building blocks, is a history of "male control of, access to, and use of women."[234]

---

[230]    *See* Maj. Op. at 87 (quoting 1 William Blackstone, *Commentaries on the Laws of England*, 442 (1765) (describing the rationale of coverture)).

[231]    *Id*. at 87 (explaining the concept of coverture as demanding that, once a woman married, her legal existence disappeared).

[232]    *See, e.g.,* Amanda Taub, *The 17th-Century Judge at the Heart of Today's Women's Rights Rulings*, N.Y. TIMES (May 19, 2022), https://www.nytimes.com/2022/05/19/world/asia/abortion-lord-matthew-hale.html (last viewed May 19, 2022) (describing a split decision in the Delhi High Court and its reliance upon the marital rape exception that Hale codified in a legal treatise written in the 1600s).

[233]    *See* Maj. Op. at 85-90.

[234]    MacKinnon, *supra* note 208, at 1301.

At the same time that it purported to anchor its holding in early American common law, the *Dobbs* majority engaged in historical fiction, disregarding evidence that undermined its view and ignoring the reproductive autonomy that American women originally exercised—autonomy that included matters of pregnancy, childbirth, and abortion.[235]  For example, historians have observed that, under the common law, and despite the views of Hale and his cohorts, abortion was condoned prior to quickening, the moment when the woman can feel the fetus move inside of her.[236]

Abortion was a widespread medical procedure in colonial America.[237]  There were no laws prohibiting it, nor did the law prohibit herbal or other concoctions as abortifacients.[238]  Indeed, Benjamin Franklin included an abortion recipe in a popular textbook that he republished in Philadelphia in 1748, and the nation did not erupt into protest.[239]  In a 1792 episode, an unwed teenager was impregnated by her brother-in-

---

[235]    *See, e.g.*, Tang, *supra* note 223, at 1109, Petersen, *supra* note 223, at 323 (collecting critiques of *Dobbs'* historical analysis).

[236]    *See, e.g.,* Tang, *supra* note 223, at 1097; Reva Siegel, *Memory Games:* Dobbs*'s Originalism as Anti-Democratic Living Constitutionalism—And Some Pathways for Resistance*, 101 TEX. L. REV. 1127, 1184 (2023) ("At the Founding and during the early republic, the common law criminalized abortion only after quickening—as late as weeks 16 to 25 in pregnancy."); Brief for American Historical Association et al. as *Amici Curiae* Supporting Respondents, *Dobbs v. Jackson Women's Health Org.*, 97 U.S. 215 (2022) at 28-30; Petersen, *supra* note 223, at 323 (collecting critiques of *Dobbs'* historical analysis).

[237]    Tang, *supra* note 223, at 1097.

[238]    Amanda Trau, *The Superficial Application of Originalism in* Dobbs*: Could a More Comprehensive Approach Protect Abortion Rights?* 50 FORDHAM URB. L.J. 867, 895 (2023) (describing the widely accessible advertisements of early America for abortion and contraception, "both for the procedure and pills or potions that would cause a miscarriage").

[239]    Emily Feng, Manuela López Restrepo, *Benjamin Franklin Gave Instructions on At-Home Abortions in a Book in the 1700s*, NPR (May 18, 2022) https://www.npr.org/2022/05/18/1099542962/abortion-ben-franklin-roe-wade-supreme- (continued…)

law.[240]  Martha Jefferson, the daughter of Thomas Jefferson, sent the pregnant woman "an herb known to treat 'menstrual obstruction,' an euphemism for pregnancy," warning that the herb could "produce an abortion."[241]  Thomas Jefferson later learned of the episode and expressed sympathy to his daughter for the pregnant woman, declaring "I see guilt in but one person, and not in her."[242]  Neither the pregnant woman nor her accomplices were arrested or charged,[243] consistent with the view that, "[i]n early America as in early modern England, abortion before 'quickening' was legal under common law and widely accepted in practice."[244]

Before the mid-1800's, pregnancy-related health care was managed by women, as midwives and medical practitioners within the community, and the government did not interfere in matters of contraception, pregnancy, childbirth, or early abortion.[245]  Abortion was only legally proscribed if undertaken after quickening, usually around the fourth or

court-leak (last viewed July 21, 2023); Paul Solman, *Early America's Complicated History with Abortion Access*, PBS (transcript) (July 31, 2022) https://www.pbs.org/newshour/show/early-americas-complicated-history-with-abortion-access (last viewed July 21, 2023).

[240]  Sarah Hougen Poggi & Cynthia A. Kierner, *A 1792 Case Reveals that Key Founders Saw Abortion as a Private Matter*, WASH. POST (July 19, 2022) https://www.washingtonpost.com/made-by-history/2022/07/19/1792-case-reveals-that-key-founders-saw-abortion-private-matter/ (last viewed July 20, 2023).

[241]  *Id*.

[242]  *Id*.

[243]  *Id*. (explaining that no one involved in the brother-in-law's prosecution believed that abortion was anything other than a private matter rather than a criminal act worthy of investigation or prosecution, and that "the saga demonstrates that the concept of abortion as a private matter was 'deeply rooted' in the minds of our nation's Founders").

[244]  Petersen, *supra* note 223 at 323 (observing that quickening was a subjective standard determined by the pregnant woman).

[245]  Siegel, *supra* note 179, at 281-82

fifth month.[246] Early American history is clear on this point, as even the *Dobbs* majority recognized that, "[i]n this country, the historical record" indicated that only the abortion of a "quick child" was criminally proscribed in the colonies.[247] The deeply rooted history and tradition of every state at the Founding afforded women the liberty to obtain an abortion prior to quickening.[248]

It was not until the mid-nineteenth century that the anti-abortion movement sprung to life with the professionalization of medicine by all-male physicians. The mid-century abortion restrictions upon which *Dobbs* relied originated with the American Medical Association, founded in 1847, which sought to eradicate female health care providers and to monopolize health care as the province of male physicians.[249] Anti-abortion campaigns targeted midwives and claimed pregnancy as medical (and male) terrain.

---

[246] Murray, *supra* note 92, at 2035 (observing that, during the time preceding the enactment of the Fourteenth Amendment, abortion was not legally proscribed if undertaken before quickening, and recounting an academic paper read before the Rutherford County Medical Society in 1860 that discussed various techniques used to effect an abortion); Siegel, *supra* note 179 at 265 ("At the opening of the nineteenth century, abortion was governed by common law, and was not a criminal offense if performed before quickening—the point at which a pregnant woman perceived fetal movement, typically late in the fourth month or early in the fifth month of gestation."); *see also* Maj. Op. at 131 n.94.

[247] *Dobbs*, 597 U.S. at 245 (recognizing that "[m]anuals for justices of the peace printed in the Colonies in the 18th century typically restated the common law rule on abortion," under which "a pre-quickening abortion was not itself considered homicide" or otherwise proscribed).

[248] Tang, *supra* note 223, at 1097 ("The [*Dobbs*] majority thus did not dispute that, as of the Founding, *every single state in the union* respected the distinction between pre- and post-quickening abortions, under which a pregnant person was at liberty to obtain the procedure prior to quickening.") (emphasis in original) (cleaned up).

[249] Murray, *supra* note 92 at 2035 (observing that the criminalization of abortion was "spearheaded largely by physicians, who associated contraception and abortion with the lay 'folk medicine' of homeopaths and midwives, many of whom were Black and Indigenous women").

The profession of medicine justified its anti-abortion campaign not as a matter of self-interest, but as a matter of public safety and the protection of women from abortion.[250] These nineteenth century physicians were transparent in this intent, arguing that regulating women's reproductive conduct was necessary to protect potential life, to keep women performing their marital and maternal obligations, and to preserve the ethnic character of the nation.[251] In framing abortion as "a vehicle of social disorder,"[252] the physicians argued that abortion posed broader demographic concerns because the birth rate of white, Protestant, native-born women had fallen relative to that of immigrant and nonwhite populations.[253] To advance nativist interests and to protect the nation's character from being altered by these demographic changes, early anti-abortion laws sought to prevent the white, native-born birth rate from being overwhelmed by other births.[254] This history indicates that the abortion restrictions that arose in the mid-1800s

---

[250] Murray, *supra* note 92, at 2035 (discussing physicians' argument that "abortion diverted women from their 'natural' inclination toward wifehood and motherhood, posing physiological harm to women while also imperiling marriage and the family" and that "physicians opposed both contraception and abortion because they violated the natural purpose of sexuality and women's natural role as mothers").

[251] Siegel, *supra* note 179, at 265 ("The doctors who advocated criminalizing abortion quite openly argued that regulating women's reproductive conduct was necessary, not merely to protect potential life, but also to ensure women's performance of marital and maternal obligations and to preserve the ethnic character of the nation.").

[252] Murray, *supra* note 92, at 2035.

[253] *Id*. at 2036; Siegel, *supra* note 179, at 297-300; Petersen, *supra* note 223, at 323 (noting the AMA's efforts to establish a link between abortion and the declining birthrate of Protestant women, arguing that these women were shirking their natural duties and that immigrant families would soon outnumber the native-born white population).

[254] Murray, *supra* note 92, at 2036 ("the interest in regulating, and indeed criminalizing abortion was hand in glove with the effort to ensure that America remained a white nation.").

in various forms were in service of those enforcing women's perceived roles in society.[255] Concerns about the place of women in the family and in society converged with the self-serving interests of the physicians at the forefront of advocacy seeking to outlaw abortion. Although the *Dobbs* Court was made aware of this history, the Majority declined to attribute the motives of the anti-abortion campaigners to the legislators that restricted abortion.[256]

In disregarding this history, the *Dobbs* Majority dismissed the reality that women lived in the mid-1800s. When the Supreme Court selectively examined the history and traditions of this nation, what it observed was the deeply rooted subjugation of women. The same time period that saw the codification of anti-abortion statutes also saw an increase in laws designed to keep women at home and out of public spaces. For example, legislative classifications excluding women from activities ranging from lawyering to voting reinforced the patriarchal notion that a woman's place was in the home.[257] Having no right to vote, American women of that time were powerless to resist the physicians' anti-abortion crusade. Indeed, in that era, "no woman had a voice in the

---

[255] Siegel, *supra* note 179, at 265-66 (observing that physicians led the campaign to criminalize abortion, depicting the practice as inimical to women's roles as wives and mothers and to preserve the ethnic character of the nation).

[256] *Dobbs*, 597 U.S. at 254 (considering it to be "quite a leap" to attribute to lawmakers the motives of "supporters of the new 19th-century abortion laws").

[257] Tracy E. Higgins, *Reviving the Public/Private Distinction in Feminist Theorizing,* 75 CHI.-KENT L. REV. 847, 849 (1999) ("Historically, the line between the home as private and the rest of civil and political society as public was defined by social norms as well as law, and that line was clearly gendered. Legislative classifications that excluded women from public activities ranging from lawyering to bartending to voting reinforced the notion that women's proper place was the private sphere of home and family."); MacKinnon, *supra* note 208, at 1285 (describing "laws developed when women were not allowed to learn to read and write, far less vote, enunciated by a state built on the silence of women, predicated on a society in which women were chattel, literally or virtually").

design of the legal institutions that rule the social order under which women, as well as men, live."[258]

Based upon its failure to consider how the nineteenth century saw a decrease in the reproductive autonomy of women, the *Dobbs* majority concluded that, "[i]n this country during the 19th century, the vast majority of the States enacted statutes criminalizing abortion at all stages of pregnancy"[259] In particular, the *Dobbs* majority counted twenty-eight states that banned abortion.[260] As Professor Aaron Tang has persuasively established, however, even this conclusion was factually incorrect.[261] At the time the Fourteenth Amendment was adopted, only sixteen states prohibited abortion prior to quickening.[262] This discrepancy comes from the *Dobbs* Majority's failure to examine whether the criminal statutes that it relied upon distinguished between pre-quickening and post-quickening procedures in every instance. Many of the twenty-eight states "continued the centuries-old common law tradition of permitting pre-quickening abortions."[263]

There are credible assertions that the *Dobbs* Majority's review of history was factually inaccurate and dismissive of the lives of women. These assertions engender

---

[258]   MacKinnon, *supra* note 208, at 1281.

[259]   *Dobbs*, 597 U.S. at 248.

[260]   *Id*. ("By 1868, the year when the Fourteenth Amendment was ratified, three-quarters of the States, 28 out of 37, had enacted statutes making abortion a crime even if it was performed before quickening.").

[261]   *See, e.g.,* Tang, *supra* note 223, at 1099; Aaron Tang, *Op-Ed: The Supreme Court Flunks Abortion History,* LA. TIMES (May 5, 2022), https://www.latimes.com/opinion/story/2022-05-05/abortion-draft-opinion-14th-amendment-american-history-quickening (last viewed July 18, 2023).

[262]   Tang, *supra* note 223, at 1099.

[263]   *Id*. at 1128.

skepticism about the selective use of history by non-historians to defeat assertions of constitutional rights. The *Dobbs* opinion demonstrates a failure to look beyond the shallow factual record to examine the "whys" that drive historical analysis. Why was abortion prior to quickening universally condoned prior to the mid-1800s? Why was abortion widely criminalized in the mid-1800s? Who was behind the anti-abortion movement and who benefited? What was the reaction of women at the time, and what power did they have to resist these changes? Simply referring to criminal laws that subjugated the rights of women in the past as a basis to subjugate the rights of women today, without looking critically at the misogyny that prevailed at the time, seems designed to perpetuate the wrongs of our past.

What the *Dobbs* Majority got right was counting Pennsylvania among those states that criminalized abortion in the mid-1800s. In 1860, it was unlawful to administer or procure an abortion "to any woman, pregnant or quick with child, or supposed and believed to be pregnant or quick with child."[264] This was a codification of the common law applied in *Mills v. Commonwealth*, which criminalized abortion and rejected the quickening doctrine.[265] Situating *Mills* within the social framework of the time, this decision came at the height of the separate spheres doctrine that confined women to strict, socially constructed roles as wives and mothers, and reserved the public sphere of work and politics for men. Women could not vote, were restricted in available employment, and were restricted in the ways that they could own their own property. Although *Mills* rejected the quickening doctrine,[266] it did so in a case where the defendant

---

[264]   *Dobbs*, 597 U.S. at 313 (citing 1861 Pa. Laws pp. 404–405).

[265]   13 Pa. 631 (Pa. 1850).

[266]   *Id*. at 633 (holding that it is unnecessary under the common law to allege, in an indictment for attempt to procure an abortion, that "the woman had become quick").

was charged with intending to procure an abortion of a woman whose pregnancy had advanced beyond quickening, as she was "pregnant and big with child."[267] The *Mills* Court did not explain itself by way of precedent or otherwise. Just four years before *Mills*, the Court had held that quickening was a necessary averment to support a prosecution based upon abortion.[268] Reading *Mills* against its facts as we must,[269] it would appear to have gone much further than the facts warranted. And in the context of its time, *Mills* aligns with the medical profession's attempts to consolidate its medical authority (to the exclusion of other professions) over women's role in reproduction in order to preserve the social order that benefited that profession.[270]

In this and other legal questions, "historical consensus is elusive."[271] As Judge Carlton W. Reeves has observed in his recent and scholarly application of history and tradition in the context of the Second Amendment:

> This Court is not a trained historian. The Justices of the Supreme Court, distinguished as they may be, are not trained historians. We lack both the methodological and substantive knowledge that historians possess. The sifting of evidence that judges perform is different than the sifting of sources and methodologies that historians perform. *See* [*New York State Rifle & Pistil Association v. Bruen*, 142 S.Ct. 2111, 2177 (2002)] (Breyer, J., dissenting) ("Courts are, after all, staffed by lawyers, not historians."). And we are not experts in what white, wealthy, and male property owners

---

[267]     *Id*. at 633-34.

[268]     *Commonwealth v. Domain*, 6 Penn. Law Jour. 29 (Pa. 1846); Maj. Op. at 152-53.

[269]     *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 485–86 (Pa. 2009) (observing that "the axiom that decisions are to be read against their facts prevents the wooden application of abstract principles to circumstances in which different considerations may pertain").

[270]     Jonathan Gibbons Mills, who was charged with attempting to procure an abortion, was not a physician, but a dentist. *Mills*, 13 Pa. at 632.

[271]     *United States v. Bullock*, 2022 WL 16649175, at *1 (S.D.Miss. 2022) (making this observation in the context of the Second Amendment).

thought about firearms regulation in 1791. Yet we are now expected to play historian in the name of constitutional adjudication.[272]

In this historical endeavor, there appears to be a disconnect between what the United States Supreme Court has concluded as a matter of legal history and what historians consider to be history, untainted by the Supreme Court's tinkering. Indeed, "[m]uch has been written about the use of history by lawyers and judges. A common theme emerging from that literature is historians' frequent complaint that lawyers just can't seem to get it right."[273]

Whatever one thinks about the role of history and tradition in affording rights to women under the United States Constitution, the Pennsylvania Constitution's ERA did away with the antiquated and misogynistic notion that a woman has no say over what happens to her own body.[274] The right to reproductive autonomy originating in Article I, Section 1 and in the non-discrimination guarantee of Article I, Section 26 likewise are not constrained by federal law. These constitutional provisions protect Pennsylvanians from the powers of the state, and the state bears the burden of satisfying the means-ends analyses that the Majority articulates. The state will have this opportunity on remand.

---

[272] *Id.*

[273] *See, e.g.*, Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. REV. 1518, 1525 (2003); *see also Martin S. Flaherty, History "Lite" in Modern American Constitutionalism,* 95 COLUM. L. REV. 523, 526 (1995) (criticizing the poor historical methods of most constitutional theorists).

[274] *See Simeone v. Simeone*, 581 A.2d 162 (Pa. 1990) ("paternalistic presumptions and protections that arose to shelter women from the inferiorities and incapacities which they were perceived as having in earlier times have, appropriately, been discarded."); *Hopkins*, 320 A.2d 139 (recognizing the legal equality of spouses within a marriage).